# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES MCANDREW,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION NO.** |
| **v.** | : | |
| | : | |
| **BUCKS COUNTY BOARD** | : | **2:12-CV-4676** |
| **OF COMMISSIONERS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM

**Jones  II, J.**                                                      **November 8, 2013**

Pending before the court is a motion to dismiss filed by defendants Bucks County Board of Commissioners Charles Martin, Diane Ellis-Marseglia, and Robert Loughery and defendant police officers Edward Donnelly, Dennis Shook, and Thomas Waltman, seeking dismissal of Count I (First Amendment), Count II (Pennsylvania Whistleblower Law) and Count III (wrongful discharge) of the complaint. (Doc. No. 4.) After a thorough review of the record, the court will **GRANT** the motion **IN PART** and **DENY IN PART**.

## BACKGROUND

This case arises out of plaintiff's multiple complaints to his superiors about corruption and wrongdoing in the Bucks County Sheriff's Office, action which plaintiff alleges caused the county to terminate his employment in violation of the First Amendment, the Pennsylvania Whistleblower Law, and state wrongful discharge law. The complaint begins in June 2010, when plaintiff discovered that defendant George Spice, a sergeant at the sheriff's office, had "rigged bids with an auto-body repair shop." (Doc. No. 1, at 4.) Plaintiff reported this information to his superior, Thomas Waltman, a lieutenant at the sheriff's office, but plaintiff claims that defendant Waltman failed to

investigate the allegations and took no action to confront defendant Spice about the bid system. (Doc. No. 1, at 4.) In late 2010, plaintiff learned that Ollie Groman, the Bucks County Sheriff's weapons trainer, had falsely certified that certain deputy sheriffs had received gun training when they had not in fact received training. (Doc. No. 1, at 4.) Plaintiff also notified defendant Waltman about this incident, but the lieutenant again took no action to investigate or correct the certification process or discipline Mr. Groman. (Doc. No. 1, at 4.)

In November 2010, plaintiff brought these incidents to the attention of Diane M. Ellis-Marseglia, a Bucks County Commissioner, and she referred the complaint to David Rouland, an investigator with the Bucks County Controller's office with instructions to commence an investigation into the complaint. (Doc. No. 1, at 4-5.) In early 2011, Mr. Rouland interviewed plaintiff and Deputy Klein,[1] another officer in the department, and they reiterated the information they had reported to Lieutenant Waltman and Commissioner Ellis-Marseglia. (Doc. No. 1, at 5.) Shortly after beginning his investigation, however, the County Controller, Raymond McHugh, directed Mr. Rouland to cease his investigation. (Doc. No. 1, at 5.)

Plaintiff alleges that in late 2010 he was present during an interview between Lieutenant Waltman and Sergeant Browndorf, another officer of the Bucks County Sheriff's Office. (Doc. No. 1, at 5.) Plaintiff overheard Sergeant Browndorf ask defendant Waltman how he could be disciplined when none of the complaints against him had been investigated, and defendant Waltman responded, "It doesn't matter what I find out in an investigation, the Sheriff told me to find you guilty." (Doc. No. 1, at 5.) Plaintiff testified to these facts on February 14, 2011, at Sergeant Browndorf's grievance hearing and claims that Sergeant Browndorf and other officers retaliated against and

---

[1]The parties do not disclose Deputy Klein's full name.

harassed him in the following ways:

a. After Sgt. Browndorf's February 14, 2011 grievance hearing, Defendant Waltman approached Plaintiff and stated: "don't bother putting in for overtime, I'm not going to pay you for this."

b. On March 3, 2011, Sergeant White informed Plaintiff that Defendant Waltman accused Plaintiff of incorrectly preparing his daily logs. When Plaintiff asked Sergeant White what was wrong with his daily log, Sgt. White responded that he "did not know." Plaintiff had been preparing his daily log the same way for six years and not once did Defendant Waltman ever complaint about manner [sic] in which Plaintiff prepared his log.

c. At the March 3, 2011 meeting, Sgt. White informed Plaintiff that the Department had ordered five new vehicles. Sgt. White also informed Plaintiff that Defendant Waltman stated that Plaintiff would not get a new vehicle because he failed to take care of his present vehicle. Defendant Waltman's allegations that Plaintiff failed to properly care for his vehicle were and are false.

d. Following the February 14, 2011 grievance hearing, Defendant Waltman began to unfairly scrutinize Plaintiff by investigating Plaintiff's unit history on multiple occasions. Defendant Waltman singled out Plaintiff in this investigation because he did not request the unit history of other Deputies employed by the Bucks County Sheriff. Prior to testifying on February 14th, Plaintiff's unit history had not been investigated by Defendant Waltman.

e. Defendant Waltman has unfairly, and without adequate justification, spied on Plaintiff's whereabouts using the County GPS system in the hope of catching Plaintiff doing something wrong. Defendant Waltman has not subjected other Deputies to the same scrutiny.

f. On June 16, 2011, for no legitimate reason, Defendant Waltman again requested the unit history of Plaintiff and Deputy Klein and then made unsubstantiated and false accusations that Plaintiff's transmissions were invalid.

g. On July 13, 2011, Plaintiff, along with Deputy Klein, were instructed by Sergeant Browndorf to report to Havis Shield to retrieve a new vehicle. When Plaintiff went to retrieve the vehicle, Sgt. White greeted them and informed them that he had been directed by Defendant Waltman not to provide Plaintiff and Deputy Klein with a new vehicle. Instead, Sgt. White provided Plaintiff and Deputy Klein with a vehicle that had approximately 80,000 miles of use and a history of mechanical problems. In the ensuing five

weeks, said vehicle broke-down [sic] multiple times and had to be towed to the repair shop.

h        On July 28, 2011, Plaintiff and Deputy Klein were unable to put gas in their vehicle because their gas key to Core Creek Park had been deactivated. Plaintiff then proceeded to the county gas pumps, but their gas card would not work. Plaintiff was informed by County employee, David Sutterly, that he had been instructed to deactivate Plaintiff's gas card and gas keys.

i.        On July 29, 2011, Plaintiff could not log on to the Mobile Data Terminal (MDT). When Plaintiff called the Information Technology department to ascertain if the MDT was malfunctioning, he was informed that his MDT air card had been deactivated.

j.        On August 2, 2011, Defendant Waltman rescinded Plaintiff's vacation request, even though it had previously been approved. Plaintiff had to file a union grievance to have his previously approved vacation honored by his employer.

k.        On August 19, 2011, Defendant Waltman informed Plaintiff, via email, that the vehicle he and Deputy Kline [sic] were assigned to was to be turned in for maintenance. Defendant Waltman then assigned Plaintiff and Deputy Klein to holding cell duty claiming there were no other cars available. This statement was false as there were numerous cars available as a substitute while Plaintiff's assigned vehicle was being serviced. Assigning Plaintiff to holding cell duty, the least desirable duty . . .

l.        Plaintiff has been retaliated against on numerous other occasions with regard to training, access to equipment and software programs, and with regard to the terms and conditions of his employment. (Doc. No. 1, at 5-8.)

On August 24, 2011, Plaintiff informed Sergeant White that he would be filing a retaliation complaint with human resources because he believed that Lieutenant Waltman had retaliated against him for reporting wrongdoing in the Sheriff's Office. (Doc. No. 1, at 8.) Within several hours of informing Sergeant White of his intention, defendants Donnelly and Waltman removed plaintiff from the "warrant unit," assigned him to the less desirable "holding cell," and rescinded his right to choose his shift. (Doc. No. 1, at 8.)

The events leading up to plaintiff's termination began on May 25, 2011, when plaintiff

testified before a grand jury about the alleged corruption and wrongdoing in the Bucks County Sheriff Department. (Doc. No. 1, at 8.) Several months later, on July 28, 2011, while plaintiff was assigned to "warrant detail," he was directed to assist Deputy Klein, Deputy Daniel Boyle, Corporal David Prudish and Sergeant Browndorf, in the arrest of a man named Philip Romanek. (Doc. No. 1, at 8-9.) After the arrest, Mr. Romanek claimed that Sergeant Browndorf had punched him in the chest while he was being taken into custody. (Doc. No. 1, at 9.) Sergeant Browndorf denied the allegation and contended that Mr. Romanek had kicked him. (Doc. No. 1, at 9.) Plaintiff did not witness the alleged incident but was later informed by Sergeant Browndorf that Mr. Romanek had kicked him while he was helping Mr. Romanek down from the attic of the house. (Doc. No. 1, at 9.) Mr. Romanek subsequently filed a complaint regarding the incident, and, after the district attorney determined that his complaint had merit, a warrant was issued for Sergeant Browndorf's arrest. (Doc. No. 1, at 9.) In addition, defendant Donnelly ordered defendant Shook to investigate plaintiff's knowledge of and involvement in the incident. (Doc. No. 1, at 9.) On February 10, 2012, defendant Shook questioned plaintiff as to why he did not report Sergeant Browndorf's assault on Mr. Romanek, and plaintiff replied that he had not witnessed the alleged assault, that he had no knowledge of Mr. Browndorf's alleged assault on Mr. Romanek, and that he had been told Mr. Romanek had assaulted Browndorf. (Doc. No. 1, at 10.) Nevertheless, plaintiff was terminated for "violating the oath of a law enforcement officer" by failing to report that Sergeant Browndorf had punched Mr. Romanek in the chest. (Doc. No. 1, at 10.)

Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania on August 16, 2012, alleging violations of the First Amendment and the Pennsylvania Whistleblower Law as well as a wrongful discharge claim. (Doc. No. 1.) On October 18, 2012,

Commissioner Ellis-Marseglia, Commissioner Loughery, Commissioner Martin, Chief Deputy Shook, Sheriff Donnelly and Lieutenant Waltman filed a motion to dismiss, (Doc. No. 4), arguing that plaintiff's wrongful discharge claim is preempted by the Pennsylvania Whistleblower Law (PWL) and, in the alternative, that the Political Subdivision Tort Claims Act immunizes defendants from liability. They further argue that plaintiff's PWL claim should be dismissed because plaintiff has failed to allege sufficient facts to create an inference that defendants terminated his employment because of his whistleblowing activities, thereby failing to plead causation. (Doc. No. 4.) Even if the court finds proper allegations of causation, defendants point out, the PWL does not allow recovery of punitive damages. (Doc. No. 4.) Finally, defendants move to dismiss plaintiff's First Amendment claim on the following grounds: (1) plaintiff has failed to allege the Commissioner defendants' personal involvement in the alleged conduct, (2) all defendants are entitled to qualified immunity, and (3) plaintiff's speech was not protected speech under the First Amendment. (Doc. No. 4.) In response, plaintiff requests that the court allow him to withdraw his claim for wrongful termination without prejudice, (Doc. No. 5, at 1), and also concedes that he may not recover punitive damages under the PWL. (Doc. No. 5, at 15.) Therefore, the court will only address the motion to dismiss insofar as it seeks dismissal of the First Amendment (Count I) and PWL claims (Count II).

## STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation and citation omitted). After the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678; *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) ("All civil complaints must contain more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotation omitted).

## DISCUSSION

### A.) Count I: First Amendment Claim

#### 1.) Plaintiff's Speech Was Protected by the First Amendment

Defendants first move to dismiss plaintiff's complaint on the ground that plaintiff has failed to state a First Amendment claim for which relief can be granted. More specifically, defendants argue that the speech for which plaintiff claims he was disciplined and ultimately terminated was unprotected speech because plaintiff was speaking pursuant to his official duties as a government employee, not as a private citizen. (Doc. No. 4.) Plaintiff responds by arguing that the speech was protected because it concerned a matter of great public interest. (Doc. No. 5.)

The guarantee of free speech afforded to citizens under the First Amendment presents a unique concern in the context of public employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417-20 (2006) (detailing the Court's balancing of First Amendment rights with government's interest as an employer). It is well settled that people do not "surrender all their First Amendment rights by reason of their [government] employment." *Id.* at 417. Nonetheless, "[a] government entity has broader

7

discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id.*; *Waters v. Churchill*, 511 U.S. 661, 671 (1994) ("The government as employer indeed has far broader powers than does the government as sovereign."). In light of these competing concerns, the Supreme Court has created a three-part test for use in determining when speech is protected. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (citing *Garcetti v. Ceballos*, 547 U.S. 410. "A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made." *Id.*

The crux of defendants' motion to dismiss is that plaintiff was speaking as a government employee when he reported wrongdoing and corruption to his superiors and therefore his speech was not protected by the First Amendment. (Doc. No. 4, at 23-26.) The question of whether a civil servant is speaking as a citizen or a government employee is not a question that lends itself to categorical rules or bright line tests. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). For instance, the Supreme Court has cautioned that an employee's First Amendment rights are not restricted merely because the employee speaks in the workplace. *Id.* at 420-21 ("Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like any member of the general public, to hold that all speech within the office is automatically exposed to restriction."). Furthermore, speech is not unprotected simply because it concerns the subject matter of the employee's employment. *Id.* Neither are the contours of protected speech conditioned on an employee's formal job description. *Id.* at 424-25 ("We reject, however,

the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions."). Finally, as for internal reporting, speech is not unprotected merely because the employee complains internally through an official "chain of command." *Dougherty v. School Dist. of Philadelphia*, 12-CV-1001, 2013 WL 5525642, *10 (E.D.Pa. Oct. 4, 2013). Speech is unprotected, however, to the extent it was "pursuant to [an employee's] duties as a public employee," which has been interpreted to include speech "derived from special knowledge or experience acquired on the job." *Id.* at *9 (citing *Foraker v. Chaffinch*, 501 F.3d 231, 243 (3d Cir. 2007).

Squarely at issue in this case are the following statements made by plaintiff during his employment with the Buck's County Sheriff's Office:

> 14. In or around June of 2010, Plaintiff notified Defendant Waltman that Sergeant George Spicer had rigged bids with an auto-body repair shop regarding damaged Sheriff's vehicles.

> 16. In or around late 2010, Plaintiff learned that the Bucks County Sheriff's weapons trainer, Ollie Groman, falsely certified that certain Deputy Sheriffs had received gun training when they had not. Plaintiff notified Defendant Waltman of the false certifications.

> 17. On multiple occasions, Plaintiff had also raised complaints to Defendant Waltman that the Bucks County Sheriff did not have policies regarding the use of force when making arrests and did not have written procedures governing the manner in which deputy sheriffs and other personnel were to perform their duties.

> 18. In or around November of 2010, after Defendants had failed to investigate or correct the aforementioned allegations of corruption, Plaintiff notified Bucks County Commissioner, Diane M. Ellis-Marseglia, of the aforementioned corruption.

> 20. In early 2011, Investigator Rouland interviewed Plaintiff and Deputy Klein. Plaintiff and Deputy Klein informed Investigator Rouland of the details of the aforementioned corruption.

23. On February 14, 2011, Plaintiff testified at Sgt. Browndorf's grievance hearing and repeated Defendant Waltman's comments as set forth above.[2]

25. On August 24, 2011, Plaintiff informed Sgt. White that Plaintiff would be filing a retaliation complaint with the human resources department regarding the retaliatory actions of Defendant Waltman. . . .

39. With regard to the prosecution of Sgt. Browndorf, Plaintiff and Deputy Klein were interviewed by Bucks County Detectives and testified before a Grand Jury.

42. On or about February 10, 2012, Defendant, Dennis Shook, questioned Plaintiff[3] as to why he did not report Sgt. Browndorf's alleged assault. Plaintiff informed Defendant Shook that he had no knowledge of a crime since Sgt. Browndorf had informed him that Romanek had kicked him. (Doc. No. 1, at 7-10.)

The Third Circuit has categorically found that testimony, even voluntary testimony, at a grand jury hearing is protected speech. *Klein v. County of Bucks*, 12-CV-4809, 2013 WL 1310877, *6 (E.D.Pa. 2013) (quoting *Reilly v. City of Atlantic City*, 532 F.3d 216, 231 (3d Cir. 2008)). As the Third Circuit stated, "[w]hen a government employee testifies truthfully, s/he is not simply performing his or her job duties; rather, the employee is acting as a citizen and is bound by the dictates of the court and the rules of evidence." *Reilly*, 532 F.3d at 231. Therefore, plaintiff's grand

---

[2]This allegation references the immediately preceding one, which states:

22. In or around late 2010, Plaintiff was present when Sergeant Browndorf, of the Bucks County Sheriff, was interviewed by Defendant Waltman. During the interview, Plaintiff heard Sergeant Browndorf question Defendant Waltman as to how Defendant Waltman could discipline Sergeant Browndorf when Defendant Waltman had not investigated any complaints against Sergeant Browndorf. In response to Sergeant Browndorf, Defendant Waltman stated "It doesn't matter what I find out in an investigation, the Sheriff told me to find you guilty." (Doc. No. 1, at 8.)

[3]Sheriff Donnelly directed Deputy Sheriff Shook to investigate plaintiff's knowledge of and involvement in Sergeant Browndorf's alleged July 28, 2011 assault.

jury testimony as alleged in paragraph 39 of his complaint is protected speech.

The court further concludes that plaintiff's reporting of corruption and wrongdoing also implicate the First Amendment because, based on the limited information before the court, it appears that these statements were made in plaintiff's capacity as a citizen, not as a government employee. Plaintiff was a deputy at the Bucks County Sheriffs Office, and the complaint alleges that he complained to his superiors about rigged auto-repair bids, false gun-training certifications, the office's use-of-force policy, corruption, and retaliation for his whistleblowing activities. While the parties have provided only limited information from which the court may infer the boundaries of plaintiff's job responsibilities, the reporting of corruption and wrongdoing does not appear to fall within the ambit of the responsibilities of a deputy sheriff. Furthermore, it is not dispositive that plaintiff learned about the alleged wrongdoing by nature of his position with the Sheriff's Department; indeed "courts have found that public officials are uniquely qualified to comment on issues of public concern, precisely because of the access to information their positions afford them." *Dougherty v. School Dist. of Philadelphia*, 12-CV-1001, 2013 WL 5525642, *10 (E.D.Pa. Oct. 4, 2013). After carefully examining the allegations of the complaint and considering the inferences that flow therefrom, the court has determined that plaintiff has stated a plausible First Amendment claim for which relief can be granted, one which discovery may further substantiate. *Greco v. Senchak*, 12-CV-2576, 2013 WL 4520847, *9 (M.D.Pa. Aug. 26, 2013) (citing *Bell Atlantic Corp. v. Twombly*, 55 U.S. 544 (2007)); *see also* Fed.R.Civ.P. 8(a)(2) (requiring "short and plain statement of the claim showing that the pleader is entitled to relief").

### 2.) Plaintiff Failed to Allege Personal Involvement of Commissioner Defendants

To properly state a §1983 claim, a plaintiff must allege the personal involvement of each and

every defendant. *Tilli v. Ford*, 13-CV-4435, 2013 WL 5567701, *6 (E.D.Pa. Oct. 9, 2013) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). Therefore, §1983 liability cannot be predicated on a theory of *respondeat superior. Id.* "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence which must be made with appropriate particularity." *Id.* Furthermore, "a supervisor may be liable [under §1983] for her failure to train or supervise employees," so long as the failure amounts to "deliberate indifference to the rights of persons with whom the untrained employees came into contact." *Bennett v. Washington*, 11-CV-176, 2013 WL 3716520, *5 (E.D.Pa. July 15, 2013).

Defendants move for dismissal of plaintiff's First Amendment claim against the Bucks County Board of Commissioners, Robert G. Loughery, Diane M. Ellis-Marseglia, and Charles H. Martin, on the ground that plaintiff has failed to allege their personal involvement in any of the unconstitutional conduct set forth in the complaint. (Doc. No. 4, at 13.) In response, plaintiff argues, "Defendant Commissioners had already abandoned their public oversight duties when they allowed Controller McHugh to call off the investigation being conducted by Mr. Rouland." (Doc. No. 5, at 17.) He further argues, "Common sense and reasonableness make clear that Plaintiff's complaints of corruption to Defendant Ellis-Marseglie [sic] was notice to all the Commissioners, especially after Defendant Ellis-Marseglia ordered Mr. Rouland to investigate public corruption." (Doc. No. 5, at 17.)

Plaintiff mentions the Commissioners only twice in the complaint, and neither of these references suffices to state a claim under the federal pleadings standards. The complaint's first reference to the Commissioners appears in paragraph 51:

> 51. At all times relevant, Defendant, Bucks County Commissioners, failed to train, discipline and/or supervise the actions of the Defendants Donnelly,

Shook and Waltman.

52. Upon information and belief, Defendants, Bucks County Commissioners, knew that Defendants Donnelly, Shook and Watlman [sic], had previously committed similar Constitutional violations, but failed to discipline said Defendants and failed to take any measures to prevent said Defendants from violating Plaintiff's Constitutional rights and from committing similar Constitutional violations in the future.

Paragraph 51 amounts to a threadbare recital of failure to train/supervise liability and does not suffice to meet the federal pleading standards for personal involvement under §1983. As for paragraph 52, these allegations formulaically repeat the standard for supervisor "knowledge and acquiescence" liability and are therefore insufficient. Next, plaintiff alleges:

18. In or around November of 2010, after Defendants had failed to investigate or correct the aforementioned allegations of corruption, Plaintiff notified Bucks County Commissioner, Diane M. Ellis-Marseglia, of the aforementioned corruption.

19. Commissioner Marseglia referred Plaintiff's complaints to investigator, David Rouland, from the office of the Bucks County Controller.

20. In early 2011, Investigator Rouland interviewed Plaintiff and Deputy Klein. Plaintiff and Deputy Klein informed Investigator Rouland of the details of the aforementioned corruption.

21. Shortly after Mr. Rouland began his investigation, he was directed by Defendant, Raymond McHugh, the County Controller at the time, to stop his investigation. (Doc. No. 1, at 4-5.)

These allegations, while they do not suffer from the same defect as paragraphs 51 and 52, simply fail to allege liability on the part of Commissioner Ellis-Marseglia in the first place. In fact, they demonstrate rather compellingly that the Commissioner took plaintiff's complaint seriously and undertook an investigation into its veracity. Finally, it should be noted that plaintiff's general references to all defendants do not suffice to allege liability on the part of the County Commissioners. At one point, plaintiff states:

11.     At all times relevant, Defendants acted jointly and in concert with each other. Each individual Defendant had the duty and opportunity to protect the Plaintiff from the unlawful actions of the other Defendants but each Defendant failed and refused to perform such duty, thereby proximately causing Plaintiff's injuries. (Doc. No. 1, at 6.)

Such general allegations of personal involvement constitute conclusory allegations and do not withstand the federal pleading requirements. *Wood v. Bethlehem Area Vocational Technical School*, 12-CV-4624, 2013 WL 2983672, *11 (E.D.Pa. June 17, 2013).[4] As such, plaintiff has failed to state a claim against the Commissioners for which relief can be granted. Therefore, the court will **GRANT** defendants' motion to dismiss the First Amendment claim against the Commissioner Defendants.

### 3.) Qualified Immunity Does Not Apply

Qualified immunity "shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996). In order to overcome a qualified immunity defense, "the right allegedly violated must be established, not as a general proposition, but in a particularized sense so that the contours of the right are clear to a

---

[4]In *Wood*, the plaintiff alleged:

the Supervisory Defendants . . . either directed the conduct which resulted in the violation of the Plaintiffs' [*sic*] federal rights as alleged; or, had actual knowledge of the subordinates [*sic*] violation of Plaintiffs' [*sic*] rights and acquiesced in said violations; or, with deliberate indifference to the consequences, established and maintained a policy practice or custom which directly caused the violation. . . . *Wood v. Bethlehem Area Vocational Technical School*, 12-CV-4624, 2013 WL 2983672, *11 (E.D.Pa. June 17, 2013).

The district court dismissed Count III of the complaint, finding that the plaintiff's allegations, as laid out above, failed to meet the particularity requirements of the federal pleading standards.

reasonable official." *Id.* at 2094.

Here, defendants argue that plaintiff has failed to allege a constitutional right that has been violated and that plaintiff has failed to plead that defendants knew that the alleged conduct violated plaintiff's constitutional rights. (Doc. No. 4, at 20-23.) As to the first argument, the court has already determined that plaintiff has pled violations of his constitutional rights. Furthermore, defendants' arguments as to their actual knowledge of constitutional protections is inapposite. The qualified immunity inquiry focuses on whether the right is clearly established such that a "reasonable person" would have known that the person's actions violated the constitution or a statute. As such, defendants' subjective knowledge of the constitutionality of their conduct is completely irrelevant. *Crawford-El v. Britton*, 523 U.S. 574, 574-75 (1998) (finding that qualified immunity test embraces objective standard and that defendant's subject intent is irrelevant).

Furthermore, the court believes that the Supreme Court's decision in *Garcetti v. Ceballos* as well as a long line of Third Circuit cases addressing the free speech rights of government employees have settled the issue of when a government employee's speech is entitled to First Amendment Protection. *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (speech is protected if employee spoke as citizen on matter of public concern); *Baldassare v. State of N.J.*, 250 F.3d 188, 201 (3ʳᵈ Cir. 2001) ("Some years ago, we recognized that as of 1982 the law was clearly established that a public employee could not be demoted in retaliation for exercising his rights under the first amendment."). While these cases may be somewhat distinguishable from the present matter, the Third Circuit has acknowledged that there need not be "previous precedent directly on point" for a constitutional right to be clearly established for qualified immunity purposes. *Acierno v. Cloutier*, 40 F.3d 597, 620 (3d Cir. 2013). Given the substantial precedent addressing the First Amendment rights of public

employees, the court believes plaintiff's rights were clearly established at the time he was discharged from employment. As such, defendants' qualified immunity defense is without merit.

**B.) Count II: Plaintiff Properly Pled Causation Under the Pennsylvania Whistleblower Law**

In Count II, plaintiff alleges that defendants violated the Pennsylvania Whistleblower Law, by, *inter alia,* demoting, harassing, and ultimately terminating him. (Doc. No. 1.) Pennsylvania's Whistleblower Law provides, "[n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee . . . because the employee . . . makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste." 43 P.S. §1423(a) (1986). In order to make out a case of retaliatory termination, a plaintiff must plead: (1) wrongdoing and (2) a causal connection between the report of wrongdoing and adverse employment action. *Golaschevsky v. Dep't of Envtl. Res.*, 720 A.2d 757, 758-59 (Pa. 2001). "Wrongdoing includes not only violations of statutes or regulations that are of the type that the employer is charged to enforce, but violations of any federal or state statute or regulation, other than violations that are of a merely technical or minimal nature." *Id.* (citing 43 P.S. §1422 (1986)).

For the purpose of their motion to dismiss, defendants effectively concede that plaintiff has pled sufficient facts to establish "wrongdoing."[5] Defendants argue, however, that plaintiff has not adequately pled a causal connection between his alleged reports of wrongdoing and the termination of his employment from the Bucks County Sheriff's Office. In order to sustain a PWL claim, plaintiff must plead facts or surrounding circumstances supporting the inference that the reports of wrongdoing or corruption led to her dismissal. *See Golaschevsky*, 720 A.2d at 759-60; *Gray v. Hafer*, 651 A.2d 221, 225, (Pa.Commw.Ct. 1994), aff'd, 669 A.2d 335 (Pa. 1995) ("An employee

---

[5]Defendants only move for dismissal on causation grounds.

who has been terminated based on a filed report and wants to base his or her complaint on their employer's violation under the Whistleblower Law must specify how their employer is guilty of waste and/or wrongdoing. They must also show by concrete facts or surrounding circumstances that the report led to their dismissal, such as that there was a specific direction or information they received not to file the report or there would be adverse consequences because the report was filed.")

Plaintiff alleges that he reported wrongdoing on several occasions while he was employed at the Bucks County Sheriff's Office:

14. In or around June of 2010, Plaintiff notified Defendant Waltman that Sergeant George Spice had rigged bids with an auto-body repair shop regarding damaged Sheriff's vehicles.

16. In or around late 2010, Plaintiff learned that the Bucks County Sheriff's weapons trainer, Ollie Groman, falsely certified that certain Deputy Sheriffs had received gun training when they had not. Plaintiff notified Defendant Waltman of the false certifications.

17. On multiple occasions, Plaintiff had also raised complaints to Defendant Waltman that the Bucks County Sheriff did not have policies regarding the use of force when making arrests and did not have written procedures governing the manner in which deputy sheriffs and other personnel were to perform their duties.

18. In or around November of 2010, after Defendants had failed to investigate or correct the aforementioned allegations of corruption, Plaintiff notified Bucks County Commissioner Diane M. Ellis-Marseglia, of the aforementioned corruption.

20. In early 2011, Investigator Rouland interviewed Plaintiff and Deputy Klein. Plaintiff and Deputy Klein informed Investigator Rouland of the details of the aforementioned corruption.

23. On February 14, 2011, Plaintiff testified at Sgt. Browndorf's grievance hearing and repeated Defendant Waltman's comments as set forth above.

25. On August 24, 2011, Plaintiff informed Sgt. White that Plaintiff would be filing a retaliation complaint with the human resources department regarding the retaliatory actions of Defendant Waltman . . .

39.     With regard to the prosecution of Sgt. Browndorf, Plaintiff and Deputy Klein were interviewed by Bucks County Detectives and testified before a Grand Jury. (Doc. No. 1, at 7-9.)

Plaintiff further alleges that, after he reported the foregoing acts of wrongdoing, defendants refused to pay plaintiff for overtime work, made plaintiff redo his daily logs for "incorrectly preparing" them, rejected plaintiff's request for a new vehicle "because he failed to take care of his present vehicle," "investigat[ed] Plaintiff's unit history" despite never doing so before, spied on his whereabouts "in the hope of catching Plaintiff doing something wrong," requested information about plaintiff and made "false accusations" about him, provided plaintiff with a problematic vehicle, deactivated plaintiff's gas and Mobile Data Terminal cards, rescinded an already approved vacation request, and assigned plaintiff and another officer to "holding cell duty," one of the least desirable jobs. (Doc. No. 1, at 8-11.) In addition, plaintiff claims defendants retaliated against him on numerous other occasions but offers no dates or specific factual allegations as to the nature of the retaliation. (Doc. No. 1, at 11.)

Plaintiff also alleges that he informed Sergeant White on one occasion that he was planning to file a retaliation complaint. (Doc. No. 1, at 11.) Almost immediately after this conversation, he was removed from the "warrant unit," was "assigned to a holding cell[,] and [lost his] right to choose [his] shift." (Doc. No. 1, at 11.) The culmination of defendants alleged retaliatory actions occurred on February 21, 2012, when plaintiff's employment with the Sheriff's Office was terminated. (Doc. No. 1, at 13.)

It is defendants' position that the allegations linking plaintiff's whistleblowing activities with the aforementioned adverse employment actions are either too temporally remote to infer retaliation or too conclusory to withstand *Twombly* and *Iqbal*. (Doc. No. 4, at 15-17.) While plaintiff does make

some conclusory allegations that do not withstand federal pleading standards, the court believes plaintiff has alleged enough facts to raise an inference of plausible retaliation, one which discovery may further substantiate.

In analyzing whether the motive for an adverse employment action is retaliatory, courts in the Third Circuit have looked at two factors: "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period." *Hussein v. UPMC Mercy Hosp.*, 466 Fed.App'x 108, 112 (3d Cir. 2012). In the absence of either of these factors, courts may consider the record as a whole to determine whether a retaliatory motive can be inferred. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000). Indeed, case law in this circuit "has set forth no limits on what [courts] have been willing to consider." *Id.* With that in mind, it is worth emphasizing that "it is causation, not temporal proximity or evidence of antagonism, that is an element of plaintiff's prima facie case, and temporal proximity or antagonism merely provides an evidentiary basis from which an inference can be drawn." *Id.*

As for the first method of proving causation, plaintiff simply fails to create a plausible inference of retaliation by way of temporal proximity alone. The complaint indicates that plaintiff's last whistleblowing activity occurred on August 24, 2011, when he informed Sgt. White that he would be filing a retaliation claim with the human resources department. (Doc. No. 1, at 11.) This event occurred almost six months before plaintiff's termination, the only adverse employment action for which plaintiff seeks damages.[6] Six months is simply too long to infer, based on temporal proximity alone, that defendants terminated plaintiff for retaliatory reasons. *Razzoli v. Director of*

---

[6]All other allegations that can be construed as retaliation on the part of defendants occurred more than 180 days before the filing of plaintiff's complaint and are therefore barred by the appropriate statute of limitations. 43 P.S. §1424(a).

*Bureau of Prisons*, 293 F.App'x 848, 852 (3d Cir. 2008) (five months creates no inference of retaliation); *Scheier v. Lawyers Title Ins. Corp.*, 11-CV-617, 2013 WL 1489391, *2 (E.D.Pa. April 11, 2013) (six months); *Washco v. Fed. Express Corp.*, 402 F.Supp.2d 547, 559-560 (E.D.Pa. 2005) (five months); *Boykins v. Lucent Technologies, Inc.*, 78 F.Supp.2d 402, 415 (E.D.Pa. 2000) (six months); *Urey v. Grove City College*, 94 F.App'x 79, 81 (3d Cir. 2004) (four months generally creates no inference); *Gaston v. U.S. Postal Service*, 319 F.App'x 155, 159 (3d Cir. 2009); but see *Morrin v. Torresdale Frankford Country Club*, 07-CV-5527, 2008 WL 2389469, *4 (E.D.Pa. June 11, 2008) (no bright line rule in Third Circuit concerning what time period creates inference of retaliation).

Neither does there exist a pattern of antagonism linking plaintiff's whistleblowing activities and his termination. The last date on which plaintiff alleges antagonistic conduct by defendants was August 24, 2011, the date that defendants Donnelly and Waltman removed plaintiff from the warrant unit for filing a retaliation complaint with the human resources department. As stated above, plaintiff's employment was terminated on February 21, 2012. Therefore, nearly six months passed during which time defendants engaged in no antagonistic conduct vis-a-vis plaintiff. This factual scenario can hardly be described as a pattern of antagonism.

Nevertheless, the court believes that the complaint, when viewed as a whole, contains sufficient allegations to nudge plaintiff's PWL claim "across the line from conceivable to plausible." *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). First, plaintiff has made several allegations that rather strongly indicate that defendants have retaliated against plaintiff in the past. For instance, plaintiff explains that on February 14, 2011, he testified against defendant Waltman at Sergeant Browndorf's grievance hearing, after which defendant Browndorf approached him and said, "don't both putting

in for overtime, I'm not going to pay you for this." (Doc. No. 1, at 8.) Of course, the complaint does not indicate whether an officer would normally get paid to testify at a grievance hearing, but the court must view the allegations in the light most favorable to the plaintiff and resolve doubt in his favor. *Watson v. Abington Tp.*, 478 F.3d 144, 152-53 (3d Cir. 2007). Given the culpable nature of plaintiff's testimony at the hearing and the timing of Mr. Browndorf's comment, the circumstances are certainly suspicious.

Plaintiff also claims that soon after the hearing defendant Waltman began accusing him of improperly preparing his daily log despite his having prepared it the same way for six years. (Doc. No. 1, at 9.) On March 3, 2011, plaintiff claims that the department ordered five new vehicles, but that he was not assigned to one because he "failed to take care of his present vehicle," something plaintiff vehemently denies. (Doc. No. 1, at 9.) The complaint also indicates that in July plaintiff's gas cards and Mobile Data Terminal (MDT) card were deactivated for no reason. (Doc. No. 1, at 10.) On August 2, 2011, defendant Waltman allegedly rescinded plaintiff's vacation request even though it had already been approved and on August 19, 2011, and assigned plaintiff and Deputy Klein to "holding cell duty, the least desirable duty," instead of patrol duty. (Doc. No. 1, at 10.) Defendant Waltman's stated reason was that there were no patrol cars available, but plaintiff claims that was a lie. (Doc. No. 1, at 10.)

Finally, plaintiff alleges that defendants began closely scrutinizing him after he testified at the February 14, 2011 hearing. For instance, defendant Waltman investigated plaintiff's unit history on multiple occasions after the hearing even though he had never checked his unit history before. (Doc. No. 1, at 9.) Furthermore, defendant Waltman "spied on Plaintiff's whereabouts" by tracking his location with the county GPS system, something he did not do to any other officers. (Doc. No.

1, at 9.) Finally, on June 16, 2011, defendant Waltman again requested plaintiff's unit history, along with Deputy Klein's, without giving a reason and accused him of making invalid transmissions.[7] (Doc. No. 1, at 9.)

These allegations, when viewed in the aggregate, demonstrate a plausible claim under the PWL. It is true that plaintiff did not suffer an adverse employment action or antagonistic activity for almost six months after his last whistleblowing activity. Nonetheless, temporal proximity is simply a proxy for more compelling evidence of retaliatory motive. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) ("it is important to emphasize that it is causation, not temporal proximity or evidence of antagonism, that is an element of plaintiff's prima facie case, and temporal proximity or antagonism merely provides an evidentiary basis from which an inference can be drawn."). The allegations in plaintiff's complaint evidence prompt retaliation to plaintiff's reports of corruption and wrongdoing throughout much of 2011. Although a temporal gap between whistleblowing and adverse employment action often rebuts an inference of causation, in this case the time gap equally permits an inference that defendants waited for an opportune moment to retaliate, such as the events surrounding Mr. Romanek's arrest on July 28, 2011. As such, the court will **DENY** plaintiff's motion to dismiss insofar as it seeks dismissal of plaintiff's PWL claim.

## C. Count III: Wrongful Termination

In response to defendants' motion to dismiss Count III, plaintiff requests that the court allow him to withdraw his wrongful discharge claim without prejudice. (Doc. No. 5, at 3 n. 1.) The Federal Rules provide, "the plaintiff may dismiss an action without a court order by filing: (i) a notice of

---

[7]The complaint does not explain what plaintiff means by "transmissions" or why they were "invalid."

dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal signed by all parties who have appeared." Fed.R.Civ.P. 41(a)(1)(A). A dismissal pursuant to this provisions is deemed to be without prejudice. *Id*. Because defendants have not yet filed an answer or a motion for summary judgment, the court will **GRANT** plaintiff's **MOTION TO WITHDRAW WITHOUT PREJUDICE**.

<u>**CONCLUSION**</u>

In light of the foregoing, the court will **GRANT** defendants' motion **IN PART** and **DENY IN PART**. The court will **GRANT** the motion to dismiss plaintiff's First Amendment claim against the County Commissioners for failure to plead personal involvement. Because it is possible that this error may be corrected, the First Amendment claim will be **DISMISSED WITHOUT PREJUDICE**, but only as to defendant Commissioners, and the court will **GRANT PLAINTIFF LEAVE TO AMEND** his complaint. The court will **DENY** the motion to dismiss as it relates to all other matters.

> **BY THE COURT:**
>
> <u>**/s/ C. Darnell Jones   II,   J.**</u>
> **C. DARNELL JONES   II,   J.**