**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES MCANDREW,** | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO.:** |
| **v.** | : | |
| | : | |
| **BUCKS COUNTY BOARD OF** | : | **2:12-CV-4676-CDJ** |
| **COMMISSIONERS, et al.,** | : | |
| **Defendants** | : | |

| | | |
|---|---|---|
| **WILLIAM J. KLEIN,** | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO.:** |
| **v.** | : | |
| | : | **2:12-CV-4809-CDJ** |
| **COUNTY OF BUCKS, et al.,** | : | |
| **Defendants** | : | |

**Jones, J.**

**April 29, 2016**

**MEMORANDUM**

Now pending before the Court is Defendants' Motion for Summary Judgment against William Klein (Dkt No. 32) [hereinafter "MSJ"], Defendants' Statement of Undisputed Material Facts (Dkt No. 34) [hereinafter "Defs.' SUMF"], Plaintiff Klein's Joint Response (Dkt No. 41-2 ) [hereinafter "Pls.' Resp."],[1] Plaintiffs' Joint Counterstatement of Material Facts (Dkt. No. 41-1) [hereinafter "CSOF"], Defendant's Reply Brief (Dkt. No. 46) [hereinafter "Rep."], Defendant's Response to Plaintiffs' Counterstatement of Material Facts (Dkt. No. 47) [hereinafter "Defs.' Resp. to CSOF"], and other supporting documents. Defendants move for summary judgment against Plaintiff William Klein in his action alleging a violation of his First and Fourteenth Amendment rights to free speech as well as his rights under the Pennsylvania Whistleblower Law.[2] After a thorough review of the motion and the parties' respective briefing, and for the reasons below, the Motion will be **GRANTED IN PART, DENIED IN PART.**

---

[1] Plaintiffs McAndrew and Klein filed a joint response to Defendants' separate motions for summary judgment, therefore the Court will refer to that document as, "Pls.' Resp.," even though it only considers Defendants' Motion for Summary Judgment against William Klein in this Memorandum Opinion.

[2] The Court notes that this is technically a consolidated action. (See Consolidation Order, Dkt. No. 24.) This Statement of Facts will, where appropriate, refer to "Plaintiffs," when referencing both Klein and McAndrew.

## STATEMENT OF FACTS

### I.   Plaintiff Klein's Background

Plaintiff Klein is a former Bucks County Sheriff's Deputy. (CSOF ¶ 2.) Klein undertook his Sheriff's Academy training in the late summer of 2006, and began working shortly thereafter in the Bucks County Sheriff's Department's Sheriff's Detention Unit. (CSOF ¶ 2.) In 2009, Klein joined the Warrant Unit, where he worked under the supervision of Sergeant Gary Browndorf. (CSOF ¶ 2.) He was reassigned from the Warrant Unit to the Detention Unit in late August of 2011. (CSOF ¶ 2.)

### II.   Plaintiffs' Observed Malfeasance and Ensuing Speech

Plaintiff Klein, and his former partner and co-Plaintiff in this consolidated action, James McAndrew, observed and reported several instances of malfeasance while employed by the Bucks County Sheriff's Department. The allegations explained in greater factual detail below, include: lapsed and forged firearm certifications, a lack of policies and procedures concerning the use of force, sleeping on the job, poor vehicle maintenance and corruption.

#### A.  Lapsed and Forged Firearms Certifications

Plaintiff Klein, a certified firearms instructor and armorer, learned in early 2010 that a fellow firearms instructor, Lieutenant Thomas French, was not certified to be a firearms instructor. (Amend. Compl. ¶ 17-18; Klein Dep. 38:18-39:20, Oct. 28, 2013, ECF No. 41-4.) Klein then raised the issue with a number of departmental personnel, including several other deputies and Lieutenant Thomas Waltman. (Klein Dep. 39:15-40:7.) Sheriff Donnelly, after learning about the certification situation, instructed recertification to be completed "quietly." (Klein Dep. 41:17-24.) Shortly thereafter, Klein learned that Deputy Oliver Groman—one of Bucks County Sheriff Department's certified armorers—approved the certifications of approximately fifty deputies. (Klein Dep. 43:5-44:9.) Klein asserted that he "knew that these certifications were done illegitimately because Groman was not present during range qualifications."[3] (Klein Dep. 43:2-12.) Sometime later, Klein discussed the issue with David

---

[3] The CSOF also mentions Klein's belief that these certifications were illegitimate because of the short timeframe during which the certifications were granted, it being very difficult to certify approximately fifty officers in only a few days. (CSOF ¶ 16.) However, when confronted with the Complaint at his deposition, which contained the original averment on this point, Klein explained that he did not write that statement or understand to what it was referring. (Klein Dep. 44:5-23.)

Rouland, an investigator in the Bucks County Controller's Office, and Bucks County Commissioner Diane Ellis-Marseglia. (Klein Dep. 51:4-24.)

### B.   Lack of "Use of Force" Policies and Procedures

Plaintiff Klein, and his partner, McAndrew, both complained about a lack of departmental use of force procedures to their supervisors. (Klein Dep. 59:22-60:4; McAndrew Dep. 139:16-140:15 ,  Nov. 22, 2013, ECF No. 41-6.) Specifically, Klein was concerned that the lack of use of force protocols and guidelines created a risk to the safety of officers and citizens, as well as potential liability for the county. He communicated these concerns to Sheriff Donnelly and Lieutenant Waltman. (Klein Dep. 62:24-63:21.) Although his position did not entail "promulgating, creating, or enforcing policies," Klein began drafting a use of force policy. (Klein Dep. 65:10-12.) Klein, when asked whether he discussed this issue any further with the Sheriff, responded that the "Sheriff told me not to talk to him anymore to go through my chain of command." (Klein Dep. 67:11-15.) When pressed to elaborate, Klein explained that it was not clear whether Donnelly was referring to the use of force issue, or all of Klein's complaints. (Klein Dep. 67: 12-18.)

### C.  Sleeping Deputy

Plaintiff Klein reported that he observed a fellow Sheriff's Deputy sleeping in the courtroom. (Klein Dep. 182:22-183:4.) Klein testified at his deposition that this deputy was "known for being in a courtroom and either doing Sodoku puzzles or sleeping or just basically not doing what he was supposed to be doing." (Klein Dep. 183:9.) After a particular incident where Klein caught this Deputy sleeping, Klein reported the sleeping deputy to Corporal Golder. (Klein Dep. 184:1-2.) When it appeared to Klein that the supervisors were ignoring the issue, Klein followed up with Corporal Prudish. (184:24-185:4.) From Corporal Prudish, the report appeared to work its way up the chain of command—from Corporal Prudish to Corporal Golder, from Golder to Sergeant Wilson, from Wilson to Lieutenant Waltman, and from Waltman to Sergeant Gary Browndorf. (Klein Dep. 185:2-10.) Klein testified during his deposition that Golder, Wilson, and Waltman "went nuts" over the report—criticizing Klein for "ratting out a fellow union member." (Klein Dep. 185:4-15.) Specifically, Klein testified that "Waltman said that Klein is up here starting trouble…And he was apparently in the office saying that I was going to be fired for ratting out a fellow union member." (Klein Dep. 185:12-15.)

### D. Poor Vehicle Maintenance

Plaintiff Klein complained about the state of the cars he shared with McAndrew. (Klein Dep. 127:15-128:16.) During their tenure in the Warrant Department, Klein and McAndrew were assigned to three cars, each of which, they contend, was maintained in a state of "disrepair." (Klein Dep. 126:2-4.) At the direction of Lieutenant Waltman, and possibly Corporal Spicer, Klein and McAndrew would submit work orders for their vehicles. (Klein Dep. 135:18-136:7.) Klein testified at his deposition, however, that service was never actually completed; rather, the mechanics "would plug in a scan tool and delete the fault code that sets off your check engine light telling you to service the vehicle." (Klein Dep. 128:8-11.) After driving the vehicle for a short time after servicing, the check engine light would reappear and Klein and McAndrew would take the vehicle to be re-serviced. (Klein Dep. 128:11-16.) Issues seemed to come to a head in early June of 2011, when Pete McElroy, the individual in charge of departmental vehicle maintenance, complained about the state of Klein and McAndrew's vehicle to other members of the Sheriff's Department. (Klein Dep. 129:24-130:6; 131:4-20.) The issue was ultimately resolved when Klein wrote an email "justif[ying] all the issues that Pete McElroy had raised or at least explain[ing] them." (Klein Dep. 134:19-24.)

Klein also complained that, in his opinion, the assigned vehicles did not meet the standards required by the Pennsylvania Motor Vehicle Code because they did not have sirens or "appropriate lighting." (Klein Dep. 136:12-16.) The lack of sirens or lighting, in Klein's estimation, impeded his ability to respond to "assist officer" calls. [4] (Klein Dep. 137:5-138:2.) Klein testified at his deposition that he "probably" raised this issue with Lieutenant Waltman and Sheriff Donnelly, but they failed to act. (Klein Dep. 136:17-23.) When Chief Shook joined the Department, Klein raised the issue with Shook. (Klein Dep. 136:17-137:5.)  Klein went so far as to point the newly hired Chief to a provision of the Motor Vehicle Code Klein believed the Department had been violating, although it is not clear which provision. (Klein Dep. 136:17-137:5.) Shook directed Klein to use his car's horn to move through traffic. (Klein Dep. 138:4-9.)

### E. Corruption

Plaintiff Klein, and his partner, McAndrew, complained about four different types of perceived "corrupt" activity in which they were forced to participate: (1) monitoring the political

---

[4] Klein describes an "assist officer" call as "about the most serious call you can get on your radio." (Klein Dep. 137:11-12). During an assist officer call, "[the issuing law enforcement officers] hit an emergency button and they're in a fight for their life somewhere." (Klein Dep. 137:12-14).

activity of fellow deputies, (2) receiving county funds for distributing Sheriff Donnelly's campaign material at public events, (3) assembling and posting political signs throughout Bucks County in support of Sheriff Donnelly's campaign, and (4) fixing mechanics' estimates for department vehicle repair.[5]

First, Plaintiffs complained that they were directed by departmental leadership to ascertain whether their colleagues supported Sheriff Donnelly's re-election. (Klein Dep. 71:8-12; McAndrew Dep. 64:18-21, 76:3-23.) Specifically, Klein alleged that Sheriff Donnelly called Sergeant Gary Browndorf—Klein and McAndrew's supervisor—to ask Browndorf to direct "one of his guys" to observe a deputy's lawn. (Klein Dep. 71:5-9.) The purpose of the observation, Klein alleges, was to determine whether the deputy in question had a lawn sign supporting Sheriff Donnelly's election opponent. (Klein Dep. 71:8-12; 75:2-4.) Browndorf then asked McAndrew to carry out the Sheriff's request. McAndrew, with Klein, complied. (Klein Dep. 75:19-20.) McAndrew later complained to Sergeant Wilson, and, along with Klein, to Defendant Marseglia. (McAndrew Dep. 78:24-79:6; Marseglia Dep. 48:20-49:1, Dkt No. 41-9.) When McAndrew did complain to Wilson, McAndrew testified that Wilson told him that, "If [McAndrew] didn't like [going to his coworkers' houses] there was [sic] forty other people who would love to have my job that would do it." (McAndrew Dep. 79:16-23.)

Second, Plaintiff Klein complained that he was paid "comp time" from the county treasury to walk in parades and hand out campaign material for Sheriff Donnelly. (Klein Dep.80:14-23; McAndrew Dep. 65:3-6.) Klein testified that, although departmental supervisors typically looked for "volunteers" to attend public events in support of Sheriff Donnelly's reelection, supervisors would provide "some kind of reward for helping out" at these events and that the culture of the department dictated that deputies "better say yes" to such requests. (Klein Dep. 80:14-23.) McAndrew testified similarly, explaining that he complained to Defendant Marseglia that county money was paid to him for walking in parades and passing out campaign materials in support of Sheriff Donnelly's re-election. (McAndrew Dep., 72:9-13.)

Third, Plaintiff McAndrew, but not Plaintiff Klein, complained that he was directly ordered by Sheriff Donnelly to assemble and post political signs supporting Donnelly throughout Bucks County. (McAndrew Dep.72:16-73:3.) According to McAndrew's deposition testimony,

---

[5]The fifth type of corruption alleged by Plaintiffs is a repeat of the allegation concerning the lapsed firearms certifications described in Part I.A. (CSOF ¶ 34(d)). Plaintiffs do not add any further substance to their allegation in ¶ 34(d), thus the contents of that allegation need not be repeated here.

Sheriff Donnelly called McAndrew and Sergeant Browndorf into his office, and directed the two deputies to report to Republican Party headquarters in their personal vehicles and plain clothes. (McAndrew Dep. 72:16-20.) At Republican Party headquarters, the two deputies found boxes of campaign signs with Sheriff Donnelly's name on them. (McAndrew Dep. 72: 21-23.) It was the deputies' job to assemble "hundreds" of signs, post them throughout the county, and then inform Sheriff Donnelly where each was located. (McAndrew Dep. 72:23-73:3; 73:24-74:1.) Although McAndrew was initially uncomfortable with this request, he did not complain officially until his discussion with Defendant Marseglia in November of 2010. (McAndrew Dep. 74:18-75:18.)

Fourth, Plaintiff Klein and McAndrew complained that Corporal George Spicer was engaged in the fixing of body shop estimates for the repair of damaged departmental vehicles. According to McAndrew, it was departmental policy to obtain three estimates for any body work needed on a Sheriff's Department vehicle, and use the lowest of the three estimates. (McAndrew Dep. 88:6-7.) On one occasion, McAndrew and Klein took a vehicle to be repaired at Davidson's, a garage in Bucks County. (McAndrew Dep. 88:8-12.) The mechanic asked to see the other bids McAndrew and Klein had received to repair the vehicle. (McAndrew Dep. 88:12-15.) When the deputies refused to show the mechanic the other estimates, the mechanic contacted Corporal Spicer. (McAndrew Dep. 88:22-24.)

Spicer, via cellphone, directed McAndrew and Klein to obtain two other estimates, and then return to Davidson's garage. (McAndrew Dep. 88:24-89:2.) Ultimately, they returned to Davidson's with two other bids—one for $3,500 and one for $750. (McAndrew Dep. 88:8-9.) When the mechanic asked to see the bids, the deputies refused his request. (McAndrew Dep. 89:9-10.) Again, the mechanic called Corporal Spicer, who directed McAndrew to throw away the $750 estimate, and give the mechanic the car so that the mechanic could obtain a fourth, higher estimate. (McAndrew Dep. 89:11, 19-24.) McAndrew reported this incident to Sergeant Browndorf, who instructed him to report the incident to Lieutenant Waltman. (McAndrew Dep. 90:6-9.) When McAndrew did so, Lieutenant Waltman told McAndrew that "if [McAndrew] didn't like the way George [Spicer] did things out on the road that [McAndrew] could work in the holding cell starting tomorrow." (McAndrew Dep. 90:14-17.) McAndrew then informed Defendant Marseglia about the incident. (McAndrew Dep 90:11-13.)

### F. The Rouland Investigation[6]

After speaking with Plaintiffs about their complaints, Commissioner Marseglia scheduled a meeting between Plaintiffs and David Rouland, an investigator employed by the Bucks County Controller's Office. (CSOF ¶ 57; Defs.' Resp. to CSOF ¶ 57.) Approximately six weeks after their initial contact with Marseglia, Plaintiffs met with Rouland. (McAndrew Dep. 99:5-6, 100:2-7.) McAndrew testified during his deposition that he and Klein discussed all the issues mentioned above with Rouland, including the political signs, driving by deputies homes (to check for signs), walking in parades, the body shop estimates, and the firearms issue. (McAndrew Dep. 100:8-14.) Rouland allegedly took notes during the meeting, and, when the meeting concluded, informed Plaintiffs that he would "get back to [Klein and McAndrew]." (McAndrew Dep. 100:5-7; see also Rouland Dep. 21:6-9, Dkt No. 38-12 (describing the procedure by which Rouland would complete his investigatory reports).)

After the meeting with Plaintiffs, Rouland informed Plaintiffs that he relayed their complaints to his boss—Bucks County Controller Raymond F. McHugh. (McAndrew Dep. 113:8-11.) Defendant Marseglia also testified that she compiled Plaintiffs' complaints and gave them to the Controller. (Marseglia Dep., 23:21-24, ECF No. 41-9.) Controller McHugh testified that he spoke to Rouland about Plaintiffs' complaints and decided that some of the issues raised did not merit further investigation. (Defs.' Resp. to CSOF ¶ 68.) Rouland later resigned from the Controller's Office. (Rouland Dep. 31:24-32:14.)[7]

## III. Events Preceding the Termination of Plaintiffs McAndrew and Klein

### A. Browndorf Hearing

On February 14, 2011, Plaintiffs McAndrew and Klein testified at a disciplinary hearing concerning Sergeant Browndorf's conduct. (CSOF ¶ 38; Defs.' Resp. to CSOF ¶ 38.) Plaintiffs assert that their testimony at the hearing, along with their numerous complaints about

---

[6] The  CSOF asks the Court to draw a negative inference against Defendants for failing to supply all the written documents that Plaintiffs allege were created during the Rouland investigation. (CSOF ¶ 72). It is not clear from the record that reports corresponding to Rouland's interviews with Sheriff's Department personnel ever existed. However, Defendants do admit that Rouland "often interviewed witness [sic], took notes, and prepared reports which he put in a three ring binder." (Defs.' Resp. to CSOF ¶ 69).

[7] Plaintiffs imply that Rouland resigned from the Controller's Office because Controller McHugh ordered Rouland to cease his investigation into Plaintiffs' complaints. (CSOF ¶ 62 ("McHugh Instructed Rouland not to investigate Plaintiffs' complaints of corruption. Rouland subsequently resigned after McHugh told him to cease his investigation.").)   This implication is refuted by Rouland's deposition testimony, where he states that any such allegation would be "absolutely false." (Rouland Dep. 60:11-16). Mr. Rouland testified that he resigned in the wake of his brother's death. (Rouland Dep. 31:24-32-14).

departmental problems, forms the basis of Defendants' alleged retaliation. (CSOF ¶ 43.) Plaintiffs allege in their Complaint that Lieutenant Waltman "screamed at them, telling them he would not pay [Plaintiffs] overtime for their testimony" at the Browndorf hearing. (CSOF ¶ 39 (citing Am. Compl. ¶ 47).)[8] Ultimately, Plaintiff Klein was paid for his testimony during the hearing. (Klein Dep. 158:6.)

### B.   July 26, 2011 Incident

On July 26, 2011, the Bucks County Sheriff Department's Warrant Unit, of which Klein and McAndrew were apart, was assigned to serve an arrest warrant on Phillip Romanek at the residence of his girlfriend, Samantha Doneker. (CSOF ¶ 73.)[9] Several members of the Bucks County Sheriff's Department were present at Doneker's residence, including Sergeant Browndorf, Corporal Prudish, Deputy Daniel Boyle, and Plaintiffs Klein and McAndrew. (Pls.' CSOF ¶ 74.) The group surrounded the residence and began knocking on doors and windows. (CSOF ¶ 75.) Doneker subsequently allowed the deputies to enter her residence, and conduct a search for Mr. Romanek. (CSOF ¶ 76; Defs.' Resp. to CSOF ¶ 76.) During the search, Plaintiff Klein and Deputy Boyle became aware that Mr. Romanek was hiding in Doneker's attic. (CSOF ¶ 77.)

Deputy Boyle entered the attic and handcuffed Mr. Romanek, while Klein remained below in a closet that contained a hole that served as the attic's entrance. (CSOF ¶ 78.) Plaintiff Klein then prepared to receive Mr. Romanek through the hole. (CSOF ¶ 78.) At some point while Boyle and Klein were apprehending Mr. Romanek, Sergeant Browndorf arrived on the scene. (CSOF ¶ 79.) While Boyle lowered Romanek through the attic hole to Plaintiff Klein, Sergeant Browndorf stood behind and to the right of Klein. (CSOF ¶ 81.) At some point while Boyle and Klein were lowering Romanek, Browndorf struck Romanek over Klein's right shoulder. (CSOF ¶ 85.) Klein then heard Browndorf claim that Romanek had kicked him. (CSOF ¶ 86.) According to Plaintiff McAndrew's testimony, Browndorf later claimed that Romanek had kicked him

---

[8] Plaintiffs cite to Paragraph 47 of the amended complaint filed in 12-CV-4809, which is ECF No. 13.

[9] In several places in their Response to Plaintiff's CSOF, Defendants do not issue specific denials of Plaintiffs' allegations. See, e.g., Defs.' Res. to Pls.' CSOF ¶ 73 ("Admitted that Plaintiff Klein so testified."). According to this Court's rules, "all facts set forth [in a party's statement of undisputed facts] shall be deemed admitted unless addressed by the opposing party." Policies and Procedures for Judge C. Darnell Jones, II, Civil Cases Section D.4 (available at https://www.paed.uscourts.gov/documents/procedures/jonpol.pdf). Because Defendants have not "addressed" the underlying allegation (instead, merely acknowledging how that allegation entered into evidence), this Court's rules and Federal Rule of Civil Procedure 56(e)(2) dictate that the allegations answered in the fashion of Paragraph 73 be deemed admitted.

during the extraction from the attic. (CSOF ¶ 92.) After Browndorf's blow, Klein brought Romanek to the floor and passed him to Plaintiff McAndrew and Corporal Prudish, who had just arrived on scene. (CSOF ¶ 93.)

Sometime shortly after securing Romanek inside the house, Klein testified that he heard Doneker begin to scream that Romanek had been struck by Browndorf. (Pls.' Joint CSOF ¶ 95.) Plaintiffs and Corporal Prudish then exited the residence while Sergeant Browndorf remained inside the house. (CSOF ¶ 96.)  Klein testified subsequently that he heard yelling and then witnessed Browndorf escort Doneker out of the residence in handcuffs. (CSOF ¶ 97.) Neither Plaintiff Klein nor Plaintiff McAndrew saw the interaction between Browndorf and Doneker inside the house. (CSOF ¶ 97, 100.) Both Romanek and Doneker were subsequently arrested and charged with aggravated assault on Sergeant Browndorf. (Grand Jury Test. of William Klein 69:9-15, Dkt No. 41-22.)

After the incident, none of the Deputies present filed an accurate report because, according to Klein, the "accepted practice" of the Sheriff's Department was to only file an incident when a supervisor would specifically request that the deputies do so. (CSOF ¶ 109.) In this case, Plaintiffs' supervisor, Sergeant Browndorf, never requested that such a report be filed. (CSOF ¶ 110.) Plaintiffs subsequently testified about the incident before a grand jury on September 22, 2011. (CSOF ¶ 113.) They also discussed the events of July 21, 2011 with Chief Shook, who conducted an internal inquiry into the deputies' conduct on that day. (Pls.' Joint CSOF ¶ 113.)

### C.  Subsequent Investigation

Chief Shook, after discussing with Sheriff Donnelly, launched an investigation into the conduct of the deputies present during the July 26 incident. (Shook Dep. 172:8-22, Dkt No. 41-11.) Specifically, Chief Shook testified at his deposition that he and Sheriff Donnelly decided that Shook "should investigate everyone that was there and find out what happened and why no reports were made." (Shook Dep. 172:14-18.)

 After his conversation with Donnelly, Chief Shook separately interviewed Plaintiff McAndrew and Deputy Boyle in the presence of union representative Deputy Christopher Lang. (CSOF ¶¶ 116-17; Defs.' Resp. to CSOF ¶¶ 116-17.) Lang, when asked whether he felt Chief Shook conducted the interviews differently, responded that "the only thing that specifically stands out in my mind was the questions that were asked of Deputy McAndrew were more – I

guess interview or interrogation style, whereas Deputy Boyle's interview was more yes-and –no questions." (Lang Dep. 11:9-17, ECF No. 41-12.) Deputy Lang testified further that he felt that Chief Shook was "soft" on Boyle during his interview, and "harder" on McAndrew during his interview. (Lang Dep. 13:7-10, ECF No. 41-12.)   Ultimately, Boyle testified that he was not disciplined for failing to report Romanek and Doneker's complaints. (Boyle Dep. 41:19-24.)

The parties dispute the credibility of Shook's investigation. (*Compare* CSOF Part VII.F, *with* Defs.' Resp. to Pls.' CSOF Part VII.F.) Plaintiffs allege several facts that, in their opinion, undermine the credibility of Shook's investigation. These allegations include: Shook's failure to review Klein and McAndrew's actual testimony before the Browndorf grand jury, Shook's failure to interview Romanek or Doneker, and Shook's failure to thoroughly question McAndrew and Klein about their positions relative to Browndorf and Romanek during the incident. (CSOF ¶¶ 146, 150, 152.) Plaintiffs also rely on expert testimony in support of their position. (CSOF ¶ 160). For their part, Defendants Donnelly and Shook admit that Shook only read the Browndorf grand jury presentment and summaries of Plaintiffs' testimony, Shook never interviewed Romanek or Doneker during the course of his investigation, but deny that Shook did not thoroughly question McAndrew and Klein. (Defs.' Resp. to CSOF   ¶¶ 146, 150, 152.) Defendants also deny that Plaintiffs' expert's report and conclusions are admissible. (CSOF ¶ 160.)

### D.  Reporting Policy Dispute

Plaintiff Klein disbelieves the Shook investigation because Sheriff Donnelly knew that "no one ever in the history of the department under his supervision wrote [an incident] report." (CSOF Part VII.C, p.22.) The parties agree that, at the time of the Shook investigation, there was no *written* policy or procedure for reporting the use of force in the Sheriff's Department. (CSOF ¶ 125; Defs.' Resp. to CSOF ¶ 125.)  The parties disagree, however, about whether the Sheriff's Department had a *verbal* reporting policy. (*Compare* CSOF  ¶ 127, *with* Defs.' Resp. to CSOF ¶ 127.) Plaintiffs cite the deposition testimony of Corporal Prudish, who stated that "the [reporting] policy is whenever you use force or observe force is whatever the sergeant tells you." (CSOF ¶ 127; Prudish Dep. 19:13-19, Dkt No. 41-18.) When asked, Prudish confirmed that "if the sergeant didn't tell [him] to write [an incident] down, or didn't saying anything and remained silent" he would "do nothing." (Prudish Dep. 19:23-20:2.)

In response, Defendants point to the testimony of Sheriff Donnelly. Sheriff Donnelly testified at his deposition that the department had a "verbal policy that if there [was] an incident, a report [was] to be filled out." (Donnelly Dep. 27:11-14.) Donnelly testified further that he could not remember seeing a single document recording "a use of force" between 2003 and 2012, and was not aware of the occurrence of any incident that would implicate the alleged verbal policy. (Donnelly Dep. 222:18-223:4, 224:4-15.)

### E.  Corporal Prudish's Malfeasance & Discipline

Browndorf, with Corporal Prudish's assistance, created a false report of the July 26 incident, which they then sent to Sheriff Donnelly via email on July 26, 2011. (Pls.' Joint CSOF ¶¶ 128-38; Defs' Resp. to CSOF ¶¶ 128-38.)

Although he received the email with the report on the day of the incident, Sheriff Donnelly did not advise Shook that he had an email from Browndorf with the false report until November 28, 2011. (CSOF ¶ 129; Defs.' Resp. to CSOF ¶ 129.) After he received the report, Shook compared the report to his notes from his interview with Corporal Prudish. (CSOF ¶ 130; Defs.' Resp. to CSOF ¶ 130.) Shook discovered that Prudish stated that, during his interview, no report was ever written about the incident. (CSOF ¶ 131; Defs.' Resp. to CSOF ¶ 131.)

The day after receiving the Prudish report, Chief Shook went to the Bucks County District Attorney's Office. (CSOF ¶ 133; Defs.' Resp. to CSOF ¶ 133.) Shook, with an Assistant District Attorney, reviewed Prudish's grand jury testimony, where Prudish also claimed that no incident report was ever written. (CSOF ¶ 134; Defs.' Resp. to CSOF ¶ 134.) When confronted, Prudish admitted that "Browndorf dictated what Prudish was to write [in the report], and directed Prudish to copy what was written from the Affidavit of Probable Cause prepared by Browndorf." (CSOF ¶ 136; Defs.' Resp. to CSOF ¶ 136.)

Ultimately, Prudish was caught in two misrepresentations. First, the report, authored by Browndorf through Corporal Prudish, repeated the falsehood that Romanek kicked Browndorf during the arrest. (CSOF ¶ 137; Defs.' Resp. to CSOF ¶ 137.) Second, Corporal Prudish stated—both to Chief Shook and during grand jury testimony—that no incident report was ever filed for the July 26 incident, even though Prudish authored the fictitious report on the day of the incident. (CSOF ¶ 137; Defs.' Resp. to CSOF ¶ 137.) As punishment for his complicity in drafting the fictitious report and his subsequent false statements, Shook recommended that Prudish be suspended for five days and demoted. (CSOF ¶ 138; Defs.' Resp. to CSOF ¶ 138.)

Chief Shook drafted a memorandum to Sheriff Donnelly on February 12, 2012 sharing his findings and making several recommendations for further action. (Ex. O in Support of Pls.' Resp. to Defs.' Mot. Summ. J. 1, ECF No. 41-19.) Chief Shook recommended that the Sheriff suspend and demote Corporal Prudish, and terminate Plaintiffs Klein and McAndrew. (Pls.' Ex. O 4-5.) The report does not explicitly state, but clearly implies, that Shook recommended termination for McAndrew and Klein because they failed to report Browndorf's crimes. (Pls.' Ex. O 4-5.)

### F.  Plaintiffs' Termination & the "Conflicting" Justifications

On February 21, 2012, Plaintiff McAndrew received notice of his termination from the Buck's County Sheriff's Department. (Ex. U in Support of Pls.' Resp. to Defs.' Mot. Summ. J. 6-7, ECF No. 41-25.) Plaintiff Klein received notice of his termination on March 8, 2012. (Ex. U 2, 5.)

The Parties agree that Sheriff Donnelly was the final decision-maker with respect to Plaintiffs' termination. (CSOF ¶ 161; Defs.' Resp. to CSOF ¶ 161.) However, the Parties dispute whether Defendants provided a consistent justification for terminating Plaintiffs. (*Compare* CSOF Part VIII, *with* Defs.' Resp. to CSOF Part VIII.)

Plaintiffs allege that there were no less than five different reasons provided for their termination. (CSOF Part VIII.) First, Plaintiffs point to Defendant's Motion for Summary Judgment Against Klein (ECF No. 32.) In the Motion, Defendants state that Sheriff Donnelly concurred with Chief Shook's report that Klein and McAndrew violated their oath to uphold the constitutions of the United States and Commonwealth of Pennsylvania by failing to "act on" Browndorf's crimes. (Pls.' Joint CSOF ¶ 162.)  Defendants assert that the language from the Motion supports their position that McAndrew and Klein were terminated for failing to report Browndorf. (Defs.' Resp. to CSOF ¶ 162-64.)

Second, Plaintiffs point to Sheriff Donnelly's deposition testimony, where the Sheriff agreed that his belief that McAndrew and Klein lied about what they saw on July 26, 2011 influenced his (the Sheriff's) decision to terminate Plaintiffs. (CSOF ¶ 165.) Defendants only admit that Plaintiffs accurately quoted Sheriff Donnelly's deposition testimony. (Defs.' Resp. to CSOF ¶¶ 165-66.)

Third, Plaintiffs point to the termination letters they received from Bucks County. (Pls.' Joint CSOF Part VIII.A.3.) Those letters state that Plaintiffs violated their oath to uphold the

United States and Pennsylvania Constitutions by submitting false documents to county detectives. (CSOF ¶¶ 167, 171.) The Parties agree that Donnelly did not have anything to do with writing the termination letters, and that Donnelly did not know who drafted the termination documents. (CSOF ¶ 168; Defs.' Resp. to CSOF ¶ 168.) Defendants also concede that Plaintiffs never submitted any written documentation of the arrests of Romanek and Doneker. (Defs.' Resp. to CSOF ¶ 172.) However, Defendants deny that the submission of false documentation was a factor in Plaintiffs' terminations. (Defs.' Resp. to CSOF ¶ 171.)

Fourth, according to Plaintiffs, Plaintiffs were terminated because they were aware of Prudish's false report. (CSOF ¶¶ 175-77.) Defendants respond that Sheriff Donnelly testified that he *believed*, but did not *know*, that Plaintiffs were aware of Prudish's false report, and that that belief "probably" factored into his decision. (Defs.' Resp. to CSOF ¶ 175-76.)

Fifth, and finally, Plaintiffs point to Sheriff Donnelly's deposition testimony, where Donnelly testified that he agreed with Shook's investigation and believed that the facts found supported a decision to terminate McAndrew and Klein. (CSOF ¶ 179.) Plaintiffs also allege that Sheriff Donnelly may never have reviewed the Shook report. (CSOF ¶ 180.) Defendants admit that Donnelly relied on Shook's investigation and reiterate Donnelly's belief that the facts Shook found supported a decision to terminate Plaintiffs. (Defs.' Resp. to CSOF ¶ 179.) Defendants respond further by pointing out that Donnelly stated that he could not testify that he reviewed Shook's investigation, not that he did not ever review it. (Defs.' Resp. to CSOF ¶ 180.)

### G. Browndorf Hearing

Before their termination, on February 14, 2012, Plaintiffs McAndrew and Klein testified at a disciplinary hearing concerning Sergeant Browndorf's conduct during the July 2011 incident. (CSOF ¶ 38; Defs.' Resp. to CSOF ¶ 38.) Plaintiffs assert that their testimony at the hearing, along with their numerous complaints about departmental problems, form the bases of Defendants' alleged retaliation. (CSOF ¶ 43.)

Plaintiffs allege in their Complaint that Lieutenant Waltman "screamed at them, telling them he would not pay [Plaintiffs] overtime for their testimony" at the Browndorf hearing. (CSOF ¶ 39 (citing Am. Compl. ¶ 47).)[10] Ultimately, Plaintiff Klein was paid for his testimony during the hearing. (Klein Dep. 158:6.)

---

[10] Plaintiffs cite to Paragraph 47 of the amended complaint filed in 12-CV-4809, which is ECF No. 13.

**IV.     Alleged Retaliatory Acts**

Plaintiffs allege that they were subjected to no less than fifteen retaliatory actions or threats of action by various members of the Bucks County Sheriff's Department. (Pls'. CSOF ¶ 43(a-n).) These alleged actions or threats, explained in greater detail below, include refusing to award commendations, assigning Plaintiffs to nonfunctional vehicles, and shutting off Plaintiffs access to fuel for their vehicles.

**A.   Purple Heart Denial**

Plaintiff Klein alleges that Sheriff Donnelly retaliated against him by refusing to award Klein a purple heart for an injury Klein sustained in the line of duty at the "end of 2010." (CSOF ¶ 43(a).) On October 15, 2010, Klein and several other officers attempted to apprehend a wanted individual at the individual's residence. (Klein Dep. 146:5-8.) When Klein and another deputy approached the front door, they found the target of the warrant armed with two knives. (Klein Dep. 146:12-19.) A fight ensued, and Klein was stabbed in the jaw. (Klein Dep. 146:19-147:5.) Klein apprehended the individual, and was then taken to the hospital. (Klein Dep. 146:22-23.) After the incident, Klein was awarded a law enforcement commendation by the Bucks County Board of Commissioners. (Klein Dep. 148:21-24.) Klein was also recommended for a purple heart by Sergeant Browndorf. (Klein Dep. 147:21-24.) However, he never received the award. (Klein Dep. 148:11-15.) Klein overheard a conversation between Browndorf and Donnelly's secretary, Jennie McLure, where McLure told Browndorf that Donnelly refused to approve the order for the Purple Heart. (Klein Dep. 149:9-24.)

**B.   Software Discontinuation**

Plaintiffs allege that Defendants retaliated against them by terminating Plaintiffs' access to warrant search software in their departmental vehicle between February and April of 2011. (CSOF ¶ 43(b).) During his deposition, Klein explained that the address-verifying software was integral to serving warrants because the warrant targets would not often list their real address on public documents. (Klein Dep. 95:10-16.)  In order to avoid wasting time investigating locations where the target of the warrant did not live, the deputies would utilize this software. (Klein Dep. 95:16-22.) When the Sheriff's Department terminated Klein and McAndrew's access (and, according to Klein, only their access), the two deputies claimed that they "were walking around basically blind." (Klein Dep. 95:22-24; 97:16-18.) Access was, allegedly, never restored. (Klein Dep. 97:19-20.)

### C.  Paperwork

In March 2011, Plaintiffs allege that Lieutenant Waltman began "accusing Plaintiffs of not submitting their paperwork to him, despite other supervisors receiving it." (CSOF ¶ 43(c) (citing Ex. F in Support of Pls.' Resp. to Defs.' Mot. Summ. 8, ECF No. 41-10).)[11] Klein testified at his deposition that this "had never been an issue prior to the complaints being made." (Klein Dep. 100:14-15.) Klein testified at his deposition that his pay was never reduced, nor was he ever threatened with a reduction in pay, over the paperwork issue. (Defs.' Resp. to CSOF ¶ 43(c) (citing Klein Dep. 104:18-22).)

### D.   Unit History Check

In April 2011, Waltman began to print out and review Plaintiffs' unit history. (CSOF ¶ 43(d); Defs.' Resp. to CSOF ¶ 43(d).) Plaintiffs allege that Waltman had never done this before Plaintiffs' testified at a grievance hearing for Sergeant Browndorf in February 2011. (CSOF ¶ 43(d); Defs.' Resp. to CSOF ¶ 43(d).) Defendants deny that the unit history check was retaliatory. (Defs.' Resp. to CSOF ¶ 43(d).)

### E.  Assignment to Poorly Maintained Vehicles

Plaintiffs allege that, throughout the "majority of 2011," they were assigned to "multiple malfunctioning vehicles." (CSOF ¶ 43(e) (citing (Klein Dep. 125:22-126:4).) According to Plaintiff McAndrew, Plaintiffs took their vehicle to the county garage on several occasions, but the necessary repairs were not made. (CSOF ¶ 43(e) (citing Ex. F at 11).) Plaintiffs allege further that "Waltman and Spicer told the Sheriff in March 2011 not to give Plaintiffs a functioning vehicle." (CSOF  ¶ 43(e) (citing Ex. F. at 8).)

Defendants deny Plaintiffs' characterization of their vehicle as "malfunctioning," that the vehicle assignments were retaliatory, and that Defendants told the Sheriff not to give Plaintiffs a functioning vehicle. (Defs.' Resp. to CSOF ¶ 43(e).) Defendants also point to Plaintiff Klein's deposition testimony, where he conceded that Plaintiffs received a replacement car "probably immediately after" they complained in June 2011. (Defs.' Resp. to CSOF  ¶  43(e) (citing Klein Dep. 133:9-12.)

---

[11] Exhibit F is a timeline of events prepared by Plaintiff McAndrew. The timeline is contained in email from McAndrew to the email address "wjfox@aol.com." (Ex. F at 1.) This appears to be the personal email address of Klein's attorney, William Fox. (Ex. F at 1.) McAndrew sent this to Mr. Fox on May 23, 2012 and forwarded it to Plaintiff Klein the following day. (Ex. F at 1.) It appears from the exhibit that McAndrew also forwarded the email to his father. (Ex. F at 1.)

### F.  GPS Tracking of County Vehicle

According to Plaintiff McAndrew, Waltman used GPS to monitor the whereabouts of Plaintiffs' county vehicle in the wake of the Browndorf disciplinary hearing. (CSOF ¶ 43(f) (citing Ex. F at 10).) McAndrew also claims that "Waltman admitted to not tracking other deputies' vehicles." (CSOF ¶ 43(f) (citing Ex. F at 10).) During this same conversation, McAndrew also claims that Waltman "chastised McAndrew for Plaintiffs' alleged failure to properly care of [sic] their vehicle." (CSOF ¶ 43(f) (citing Ex. F at 10).)

In McAndrew's deposition testimony, McAndrew explained that the GPS incident arose after he used his personal vehicle to report to work, and then picked up his county vehicle at some point later in the morning. (McAndrew Dep. 171:5-23.) McAndrew testified further that he was never reprimanded in connection with the personal vehicle issue. (McAndrew Dep. 172:15-20.) Finally, with respect to the maintenance issue, Klein admitted that Waltman only spoke to Browndorf about the condition of Plaintiffs' vehicle after Waltman was informed by McElroy about the vehicle's issues. (Klein Dep. 132:12-21; <u>see also</u> Part I.D for a full explanation for the vehicle issues.)

### G.  Gas Keys & Cards

According to Plaintiff Klein, in July 2011, Plaintiffs' access to gasoline for their official vehicle was totally restricted when their gas keys (which allowed them to obtain fuel in Lower Bucks County) and their gas cards (which allowed them to obtain fuel in Doylestown) were "shut off." (CSOF ¶ 43(g) (citing Klein Dep. 138:16-21).) Klein has admitted that it "wasn't uncommon" for there to be problems from time to time with the gas keys. (Defs.' Resp. to CSOF ¶ 43(g) (citing Klein Dep. 140:13-17).)

### H.  Aircard Access

Also in July 2011, Plaintiffs allege that they were further retaliated against when their aircard was shut off. (CSOF ¶ 43(h).) This prevented Plaintiffs from remotely connecting to the Sheriff's Department's online network and made it more difficult for them to submit paperwork, run drivers' licenses and license plates, and determine the validity of warrants. (CSOF ¶ 43(h) (citing Klein Dep. 99:17-18; 110:17-20).) Klein admitted there were "widespread" issues with the Department's air cards. (Defs.' Resp. to CSOF ¶ 43(h) (citing Klein Dep. 99:5-6).)

### I.  Waltman's Criticism

Plaintiffs allege that Defendant Waltman retaliated against them when he "began criticizing Plaintiffs for failing to sign in and out, and for other minor issues not previously raised prior to their complaints." (CSOF ¶ 43(i) (citing Klein Dep. 116:12-22).) Klein admitted that Plaintiffs were neither disciplined nor docked pay in relation to Waltman's complaints about their conduct. (Defs.' Resp. to CSOF ¶ 43(i) (citing Klein Dep. 117:13-18).)

### J.  Mobile Data Terminal

Plaintiffs allege that, in August 2011, Waltman refused to replace or service the nonfunctional Mobile Data Terminal in Plaintiffs' vehicle. (Klein Dep. 98:19-20.) Klein testified that he and McAndrew complained about the situation to Lieutenant Waltman, Deputy Groman, Sergeant White, and the Sheriff Department's IT department. (Klein Dep. 98: 17-99:1.) Sometime later, Plaintiffs did receive a new computer from Sergeant White. (Klein Dep. 103:7-8.) However, this computer was ultimately either taken away or stopped functioning. (Klein Dep. 103:8-9.) Defendants deny that Waltman refused to replace the nonfunctional mobile data terminal. (Defs.' Resp. to CSOF ¶ 43(j).) Klein admitted that "there were intermittent issues with computers as there are with all electronic devices." (Klein Dep. 99:2-13.)

### K.  Vacation Days

Plaintiffs allege that Lieutenant Waltman denied Plaintiffs' request for vacation time in retaliation for their complaints. (CSOF ¶ 43(k) (citing Klein Dep. 178:12-14).)

### L.  Transfer to Detention Unit

On August 24, 2011 Lieutenant Waltman transferred Plaintiffs from the Warrant Unit where they had been working to the Detention Unit. (Ex. F 14.)  This transfer was announced just hours after Klein emailed Sergeant White to tell White that Plaintiffs intended to file an official complaint against Waltman. (Ex. F 13-14.) Chief Shook, in the midst of a departmental shake-up, made Plaintiffs transfer to the Detention Unit permanent. (Shook Dep. 81:4-82:7.) According to Deputy Lang, the road assignments—where Plaintiffs had been working—were considered the best assignments and holding cell duty, to which Plaintiffs had been transferred, was the worst. (Lang Dep. 21:2-12.) Lang also testified that, if a deputy "violate[s] a specific policy, they are removed from the road and brought back in the holding cell." (Lang Dep. 21:13-21.) McAndrew admitted that "it's not like everybody hates" working in the holding cell. (Defs.' Resp. to CSOF ¶ 43(l) (citing McAndrew Dep. 199:23-24).)

**M. Shift Request Denials**

According to Plaintiffs, they were the "only deputies out of approximately 50 who were denied the shifts they requested" in December 2011. (CSOF ¶ 43(m) (citing Klein Dep. 176:11-12).) Plaintiff McAndrew also claims that he was told by another deputy that, when discussing the shift denial issue Chief Shook, Shook told this other deputy that he "he had his reasons" for denying Plaintiffs' requests. (Ex. F at 20.)

**N. Armory Key**

Plaintiff Klein also claims that Defendants retaliated against him by taking away his key to the armory. (Klein Dep. 179:23-182:18.)

## PROCEDURAL HISTORY

Plaintiff Klein filed the complaint in the instant matter on August 20, 2012. (Klein Compl., Case No. 12-cv-4809, Dkt No. 1.) Before consolidating this action with the action brought by his partner, James McAndrew (Consolidation Order, Case No. 12-cv-4676, Dkt No. 24), this Court issued separate Memoranda Opinions adjudicating Defendants' Motions to Dismiss against Plaintiff Klein and Plaintiff McAndrew respectively (Klein Mem. Op., Case No. 12-cv-4809, Dkt No. 23, April 1, 2013 [hereinafter "Klein Mem. Op."]; McAndrew Mem. Op., Case No. 12-cv-4676, Dkt No. 11, Nov. 8, 2013).

At present, Klein's Complaint consists of two counts: a deprivation of his First and Fourteenth Amendment right to free speech pursuant to 42 U.S.C. § 1983, and a violation of the Pennsylvania Whistleblower Act.[12] (Klein Amended Compl., Case No. 12-cv-4809, Dkt No. 13.)

As the bases for his claims, Plaintiff Klein alleged several instances of protected speech. These consisted of his complaints concerning: (1) improper firearms certifications (Klein Amend. Compl. ¶¶ 17-27); (2) a lack of policies and procedures related to the use of force (Klein Amend. Compl. ¶¶ 28-29); (3) an improperly certified Department armorer (Klein Amend. Compl. ¶¶ 50-55); (4) the state of departmental vehicles (Klein Amend. Compl. ¶¶ 37, 57); and, (5) a sleeping deputy (Klein Amend. Compl. ¶¶ 63-66). Klein also alleged that the First Amendment protected his testimony before a Disciplinary Hearing and Grand Jury. (Klein Amend. Compl. ¶¶ 45-49, 67-83).

---

[12] Klein's Complaint also contained a third count alleging a violation of the Family Medical Leave Act. In Plaintiffs' Joint Response to Defendant's Motion for Summary Judgment, Klein voluntarily waived this claim. (Pls.' Resp. to Defs.' Mot. Summ. J. 38, Case No. 12-cv-4676, ECF No. 36.) Accordingly, it will not be considered further.

On April 1, 2013, this Court issued a Memorandum Opinion in response to Defendants' Motion to Dismiss. In that opinion, the Court determined that First Amendment protection applied *only* to Klein's testimony before the Disciplinary Hearing and the Grand Jury. (Klein Mem. Op. 10.) In all other respects, the Court found that Klein's speech was made "in his capacity as an employee and not as a citizen." (Klein Mem. Op. 10.)  Because public employee speech is only protected where the employee speaks as a citizen, Hill v. Borough of Kutztown, 455 F.3d 225 (3d Cir. 2006), the Court limited Klein's claim to retaliation based on his Disciplinary Hearing and Grand Jury testimony. (Klein Mem. Op. at 10; see also, Order Accompanying Klein Mem. Op. 1, Case No. 12-cv-4809, Dkt No. 24 ("Count I is DISMISSED as to all Defendants and as to all allegations except to the extent that Plaintiff alleges a violation of his free speech rights … as a result of his having given testimony before a disciplinary hearing and a grand jury.").)

The Court also found that the Pennsylvania Whistleblower Law claim survived. In so deciding, the Court noted that its review was limited to the issue of causation. (Klein Mem. Op. at 5.) Assuming the veracity of the allegations contained in the Complaint (as it was bound to do), the Court found that there existed a "pattern of antagonism, coupled with timing…sufficient to raise a plausible inference of causation based upon the entire record." (Klein Mem. Op. at 6.) The Court did not, however, assess whether the substance of Klein's allegations qualified for Whistleblower Law protection.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted).  Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a

verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  "At the summary judgment stage of proceedings, courts do not 'weigh the evidence or make credibility determinations,' but, instead, leave that task to the fact-finder at a later trial if the court denies summary judgment."  Halsey v. Pfeiffer, 750 F.3d 273 (3d Cir. 2014) (quoting Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)).

## DISCUSSION

The Court's consideration of the Motion for Summary Judgment will begin with the First Amendment retaliation claim, and conclude with the Pennsylvania Whistleblower Law claim.

### I. Summary Judgment Against Plaintiff Klein is Appropriate to the Extent That His Claim Relies on the Testimony Before the Browndorf Disciplinary Hearing.

In order to evaluate a First Amendment retaliation claim, the Court employs a three-part burden shifting test. Initially, a plaintiff must show that the alleged activity was protected by the First Amendment and that that activity was a "substantial factor" in the alleged retaliatory action. Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009) (internal citations omitted). The burden then shifts to the defendant to demonstrate that it would have taken the same action, even if the protected conduct had not taken place. Id.

Defendants advance three arguments in support of their motion: (1) they challenge the extent of First Amendment protection applicable to Klein's speech; (2) they allege a failure of evidence with respect to a causal link between the allegedly protected speech and the Plaintiff's termination; and (3), they assert that there is no evidence to refute that Klein would have been fired absent his speech at the Disciplinary Hearing and Grand Jury. The Court addresses each in turn.

### A. The First Amendment Does Not Protect Plaintiff Klein's Speech Before the Browndorf Disciplinary Hearing, But Does Protect His Speech Before the Grand Jury.

Defendants move for summary judgment on the basis that Klein's speech during the Browndorf Disciplinary Hearing and Grand Jury is not entitled to First Amendment protection.

In order to show that the First Amendment protected his speech, a public employee must demonstrate three things: (1) that the speech was made in the employee's capacity as a citizen, and not as an employee; (2) the statement involved a matter of "public concern;" and, (3) the government did not possess "an adequate justification for treating the employee differently from any other member of the general public as a result of the statement made under the Pickering balancing test." Dougherty v. School Dist. of Phila., 772 F.3d 979, 987 (3d Cir. 2014).

Defendants assert that Klein's speech at the Browndorf Disciplinary Hearing was not made in his capacity as a private citizen and did not touch upon a matter of public concern. With respect to the Grand Jury, Defendants claim that their interest in the Plaintiff's failing to report a crime outweighs the Plaintiff's interest in speech, and thus that speech is not protected by the First Amendment. The Court reaches different conclusions regarding the Disciplinary Hearing and Grand Jury testimony, and will treat each in turn.

### i. Klein's Testimony at the Browndorf Disciplinary Hearing was Employee Speech.

The Court recognizes that, at the Motion to Dismiss stage, it found that Klein's speech at the Disciplinary Hearing "plausibly consitut[ed]" protected speech. (Klein Op. 10.)  Having the benefit of a full record before it, the Court now revisits the issue.

### 1.  Standard

Defendants assert that Klein did not testify at the Browndorf Disciplinary Hearing in his capacity as a citizen, and is thus not entitled to First Amendment protection. (Defs.' Mot. Summ. J. 24, ECF No. 32. ("MSJ").) The Court agrees, and will therefore grant Defendants' Motion for Summary Judgment as it relates to the Disciplinary Hearing.

In order to qualify for First Amendment protection, a public employee must be speaking in his capacity as a citizen, and not as a government employee. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). The "critical question" when categorizing the capacity of the speaker is whether the speech "itself is ordinarily within the scope of an employee's duties, and not whether it merely concerns those duties." Lane v. Franks, 134 S.Ct. 2369, 2379 (2014); see also Flora v. Cnty. of Luzerne, 776 F.3d 169, 176-77 (3d Cir. 2015) ("The controlling factor is whether the statements were made pursuant to the speaking employee's duty, that is whether such utterances were among the things that the employee was employed to do.").  The Supreme Court has emphasized that speech by a public employee is still protected by the First Amendment even if it

21

"concerns information acquired by virtue of his public employment." Lane, 134 S.Ct. at 2379; see also Dougherty v. School Dist. of Phila., 772 F.3d 979, 990 (3d Cir. 2014) ("Lane reinforces Garcetti's holding that a public employee may speak as a citizen if his speech involves the subject matter of his employment.").

This inquiry into job duties and speech is a "practical one." Dougherty, 772 F.3d at 988 (quoting Garcetti, 547 U.S. at 424). Whether a particular incident of speech was made pursuant to a public employee's job duty (and thus not protected) entails questions of both law and fact. Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007) *abrogated on other grounds by* Borough of Duryea v. Guarneri, 564 U.S. 379 (2011). "Specifically, the scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." Flora v. Cnty. of Luzerne, 776 F.3d 169, 175 (3d Cir. 2015) (internal quotations omitted).  Keeping in mind its obligations under Federal Rule of Civil Procedure 56(a) and the binding authority interpreting that rule, the Court now turns to the precise questions before it: (1) whether there exist any genuine questions of material fact concerning the "scope and content" of Klein's responsibilities as they relate to the Disciplinary Hearing; and, (2) the constitutional significance of those undisputed facts, if any exist.

### 2.  Application

There is no genuine issue of material fact concerning the scope and content of Klein's responsibilities as they pertain to the Disciplinary Hearing. Plaintiff Klein's own deposition testimony makes clear that he believed he was working when he testified. (Klein Dep. 157:8-158:-6.) When asked why he was upset when he learned that he might not be paid for his testimony, Plaintiff responded: "because we're still working. After our eight hours we're entitled to time and a half." (Klein Dep. 157:8-14.) When pressed, Klein explained further: "We weren't [at the Disciplinary Hearing] voluntarily and we were testifying as to something that occurred on duty so my opinion of it is we're – it's work related and we should have been paid for it." (Klein Dep. 157:18-21.)  In fact, Plaintiff Klein believed so strongly that he was on duty while testifying, he threatened to file a grievance if he was not paid overtime for his presence. (Klein Dep. 158:3-6) ("I don't know if we filed a grievance or if we just brought it to their attention that we were going to file a grievance if we weren't paid [for the time spent testifying at the hearing].").) Ultimately, the County paid him for his time. (Klein Dep. 158:6.)

There being no dispute that Klein believed that he was "on the clock" when he testified at the Browndorf Hearing and that he was actually paid for the time, the Court now turns to the constitutional significance of those facts. Defendants argue that because Plaintiff Klein believed that he was working while testifying, he spoke as an employee and not a citizen. (MSJ 24.) By way of response, Plaintiff Klein argues that his testimony about malfeasance in the department at the Disciplinary hearing concerned "corruption," and cites Reilly v. City of Atlantic City, 532 F.3d 215 (3d Cir. 2008) and Azzaro v. Cnty. of Allegheny, 110 F.3d 968, 978 (3d Cir. 1997) for the proposition that testimony concerning "corruption" by a police officer is citizen speech. (Pls.' Joint Resp. to Defs.' Mot. Summ. J. 6-7) ("Pls.' Resp.").

The Court finds that its decision is controlled by Garcetti v. Ceballos, 547 U.S. 410 (2006). In Garcetti, the Supreme Court considered whether an assistant district attorney spoke in his capacity as a citizen or employee when he authored a memorandum recommending that a pending prosecution be dismissed. Id. Ultimately, the Supreme Court determined that the plaintiff spoke as an employee, and not a private citizen. Id. at 422. The Court explained that when the plaintiff "went about conducting his daily professional activities," he did not act as a citizen. Id. The Court found that "when [the plaintiff] went to work and performed the tasks he was paid to perform, [the plaintiff] acted as a government employee." Id.

Like the plaintiff in Garcetti, Plaintiff Klein asks the Court to extend First Amendment protection to speech made in the course of work he was paid to perform. For the reasons laid out in Garcetti, the Court declines Klein's invitation. Put simply, the clear and undisputed facts demonstrate Plaintiff Klein's strongly held belief that he was working when he testified at the Browndorf Hearing. He stated as much during his deposition, and even went so far as to threaten formal action if he was not compensated for the time he spent at the Hearing. (Klein Dep. 158:3-6.) The Court takes Plaintiff Klein at his word, and in the absence of any authority that would compel the opposite result, finds that his speech at the Disciplinary Hearing was made in his capacity as an employee, and not a private citizen. Therefore, that speech is not protected by the First Amendment and cannot serve as the basis for a First Amendment retaliation claim.

The Court also points out that it would reach the same conclusion even under Lane v. Franks, 134 S.Ct. 2369 (2014). In Lane, the Supreme Court considered whether an employee's testimony, compelled by a subpoena, was outside the scope of his ordinary job responsibilities. Lane, 134 S.Ct. 2369 at 2378. Before determining that such speech was citizen speech, the Court

clarified that "the critical question under <u>Garcetti</u> is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." <u>Id.</u> The Third Circuit has declined on several occasions to determine the precise impact of <u>Lane</u> on <u>Garcetti</u>. <u>See</u> <u>Flora v. Cnty. of Luzerene</u>, 776 F.3d 169, 179 (3d Cir. 2015); <u>Dougherty v. School Dist. of Phila.</u>, 772 F.3d 979, 990 (3d Cir. 2014). However, this Court finds that even assuming that <u>Lane</u> narrowed <u>Garcetti</u>, Plaintiff Klein's speech would still not be considered citizen speech.  Klein's own words make clear that he believed he was working during the hearing, and his actions after the hearing (threatening formal action if he was not paid) further buttress this conclusion. In light of the foregoing, the Court need not address Defendants' alternative argument that the contents of Plaintiff Klein's speech did not touch upon a matter of public concern. Summary judgment is granted in favor of Defendants and against Plaintiff Klein insofar as his Frist Amendment claim relates to the Browndorf Disciplinary Hearing.

### ii. Klein's Testimony Before the Browndorf Grand Jury is Protected by the First Amendment

Having determined that summary judgment is appropriate as to any claim flowing from Klein's Disciplinary Hearing testimony, the Court now turns its attention to Klein's Grand Jury testimony.

The parties do not dispute that Klein's Grand Jury speech satisfies the first two elements of the First Amendment test: that Klein (1) spoke as a citizen (2) on a matter of public concern. Accordingly, the Court will only address whether Klein's Grand Jury testimony satisfies the third prong of the First Amendment test: whether the plaintiff's interest in his speech is outweighed by the government's interest as an employer .<u>See</u> <u>Dougherty v. School Dist. of Phila</u>, 772 F.3d 979, 987 (3d Cir. 2014).

Defendants argue that their interest in terminating Klein for his failure to report Sergeant Browndorf's behavior during the July 26, 2011, incident outweighs Klein's interest in his speech before the Grand Jury. (MSJ 25-28.) In Defendants' view, Plaintiff Klein's failure to report that Browndorf assaulted Romanek and Doneker presented a threat to the function of the law enforcement agency, and thus the state's interest in disciplining officers who take an oath to uphold the law outweighs Klein's interest in his Grand Jury testimony. (MSJ 27.) Defendants also argue that Klein, by virtue of his position as a law enforcement officer, should be held to a

"high standard of conduct," although it is unclear how exactly this would impact the Court's analysis. (MSJ 27-28.)

By way of response, Plaintiff Klein asserts that Defendants "mischaracterize" the subject of the protected speech, as well as the "true reason" for Klein's termination. (Pls.' Resp. 7.) In his view, the Court should consider whether "Defendants' interest in promoting efficiency of public services of the Sheriff's department, somehow outweighs Plaintiffs' interest in testifying about the department lacking use of force policies and procedures." (Pls.' Resp. 7.) Finally, Plaintiff Klein asserts that this question is one of fact that is more appropriately resolved by a jury. (Pls.' Resp. 7.)

### 1. Standard

The third prong of the First Amendment test requires a court to apply "the balancing test derived from <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968), to determine whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting workplace efficiency and avoiding workplace disruption." <u>Spring v. Henry</u>, 435 F.3d 268, 275 (3d Cir. 2006) (internal quotations omitted). "The inquiry involves a sliding scale, in which the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." <u>Munroe v. Central Bucks Sch. Dist.</u>, 805 F.3d 454, 472 (3d Cir. 2015) (internal quotations omitted).

The "fact-intensive" balancing of interests "requires consideration of the entire record, and must yield different results depending on the relative strengths of the issues of public concern and the employer's interest." <u>Miller v. Clinton Cnty.</u>, 544 F.3d 542, 548 (3d Cir. 2008); <u>see also</u> <u>Reilly v. City of Atlantic City</u>, 532 F.3d 216, 232 (3d Cir. 2008) ("Where a plaintiff claims that the stated grounds for his/her discipline were a pretext for the discipline imposed ... the court considers all of the speech that the plaintiff alleges is protected.").  "On the employee's side of the scale, [the court] must consider the interests of both [the plaintiff] and the public in the speech at issue." <u>Munroe</u>, 805 F.3d at 472 (internal citations and quotations omitted). Although the facts surrounding a particular incident of speech shape the <u>Pickering</u> inquiry, courts will often consider the extent to which the speech at issue "has a detrimental impact on close working relationships requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or interferes with the enterprises regular operations." <u>Id.</u>

## 2. Application

The Court finds that the balance of interest weighs in favor of Plaintiff Klein. In reaching this decision, the Court notes that <u>Reilly v. City of Atlantic City</u> is particularly instructive. 532 F.3d 216. In that case, the Third Circuit considered whether the plaintiff's interest in speaking out about police corruption outweighed the defendants' interest in an efficient police department. <u>Id.</u> at 232.

In the late 1980s and early 1990s, Reilly worked in the vice and intelligence units of the Atlantic City Police Department. <u>Id.</u>at 220. In that capacity, he participated in and testified at the corruption trial of Atlantic City Police Officer Dennis Munoz, a personal friend of Officer Robert Flipping. <u>Id.</u> During that time, Reilly also investigated Flipping, who would later become Atlantic City Director of Public Safety, and individuals close to Flipping. <u>Id.</u> Reilly also alleged that he made enemies with an Officer Arthur Snellbaker by virtue of Reilly's close association with then police chief, James DiNoto. <u>Id.</u> Snellbaker would later become the Chief of the Atlantic City Police Department. <u>Id.</u>

In 2000, Reilly was accused of creating a hostile work environment, lying to internal affairs, and improperly contacting witnesses. <u>Id.</u>at 221. In 2003, after arbitration by a neutral third-party, Flipping threatened to discipline Reilly by removing him from the promotion list, suspending him for ninety days, and demoting him from sergeant to patrolman. <u>Id.</u> at 221-22. Ultimately, Flipping suspended that discipline, and instead permitted Reilly to retire, provided he do so immediately. <u>Id.</u> Reilly retired, and brought suit alleging a violation of his First Amendment rights. <u>Id.</u> Reilly's suit alleged that Flipping and Snellbaker used the complaint in 2000 as a vehicle by which to retaliate against him for his speech in the Dennis Munoz matter. <u>Id.</u>at 219. Before the Third Circuit, Snellbaker argued that Reilly was not entitled to First Amendment protection for his speech in the Munoz matter because his right to speak was outweighed by the police department's interest in disciplining Reilly for creating a hostile work environment. <u>Id.</u> at 232.

The Third Circuit rejected Snellbaker's argument. <u>Id.</u> In so doing, the Third Circuit noted that "where a plaintiff claims that the stated grounds for his/her discipline were a pretext for discipline imposed, the court does not apply the <u>Pickering</u> balancing test solely to the speech that defendants claim motivated the disciplinary action." <u>Id.</u> Rather, the court must apply the <u>Pickering</u> balancing test to *both* the speech cited by the defendants as cause for discipline, and

speech cited by the plaintiff as the cause for discipline. Id. So, the Third Circuit reasoned, the district court properly held that the public's interest in hearing testimony about police corruption outweighed the defendants' interest in maintaining order by disciplining Reilly. Id.

Finally, the Third Circuit noted that: "to the extent that Snellbaker attempts to argue that his disciplinary recommendation was justified by Reilly's violations and was in no way connected to Reilly's speech in the Munoz matter, his argument *is more properly viewed as a challenge to the factual issues of motivation and rebuttal.*" Id. at 232-33. In other words, the fact that defendants cited an alternate incident of speech as their reason for terminating the plaintiff was more appropriately viewed in the context of the second and third elements of a First Amendment retaliation claim—causation and the same decision defense, and not in the first element's Pickering analysis. See Id.

The Court finds that the reasoning in Reilly guides its decision in the case at bar. Here, Defendants assert that Plaintiffs' and the public's interest in Klein's testimony must yield to Defendants' interest in discharging a deputy sheriff for failing to report a crime against a citizen. (MSJ 25.)   This argument parallels the one rejected by the Third Circuit in Reilly. Here, Defendants argue that Plaintiff Klein's admissions during the Grand Jury concerning the July 26, 2011,incident provide an independent basis for his termination. Accordingly, they frame the balance between "the state's interest in discharging a deputy sheriff for failing to report a crime against a citizen" and the "Plaintiff's interest in the speech." (MSJ 25.)   Like the defendants in Reilly, Defendants here have too narrowly constructed the balance to be made. Instead, the question is whether Plaintiff's and public's interest in exposing police malfeasance outweighs Defendants' interest in a functional Sheriff's Department. That an independent basis for terminating Klein may exist in Klein's Grand Jury testimony goes to both causation and the same decision defense, not whether the speech is entitled to First Amendment protection. See Reilly, 532 F.3d at 232-33.   Accordingly, the Court rejects Defendants' argument that Klein's speech before the Grand Jury was not protected by the First Amendment and will not grant summary judgment on this basis.

**B. Klein has Offered Sufficient Evidence that his Protected Speech was a "Substantial Factor" in his Termination to Create a Genuine Issue of Material Fact**

Mindful of its obligation to refrain from weighing the evidence at the summary judgment stage, Montone v. City of Jersey City, 709 F.3d 181, 191 (3d Cir. 2012), the Court now turns to the first question of fact: whether Plaintiff Klein has provided evidence that his speech was a "substantial factor" in his termination. Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009).

### i.  Standard

Third Circuit precedent provides three pathways for a plaintiff to demonstrate causation in a First Amendment retaliation case. Lauren W., 480 F.3d at 267. The plaintiff satisfies his burden by demonstrating (1) an "unusually suggestive temporal proximity" between the speech and the allegedly retaliatory conduct; (2) a "pattern of antagonism coupled with timing;" or, (3), that the "record as a whole" permits the trier of fact to infer causation. Id.  The Court also notes that the Third Circuit requires that the decision makers be aware of the protected speech. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decision makers must be aware of the protected conduct.")

### ii.  Application

The Court finds that, even minding its obligation of intense scrutiny, Lauren W., 480 F.3d  at 268, Plaintiff Klein has offered sufficient evidence to create a genuine issue of material fact as it pertains to the antagonism and timing test. Again, the Court turns to the Third Circuit's decision in Reilly v. City of Atlantic City, 532 F.3d 216, 233 (3d Cir. 2008), as the controlling authority.

Aside from his arguments concerning the extent of First Amendment protection (See Discussion Part I.A.i.2), a defendant in Reilly argued that the district court committed reversible error by leaving the causation question to the jury. Reilly, 532 F.3d at 233. He argued that the length of time between Reilly's speech and the adverse employment action—approximately ten years—foreclosed any possible First Amendment violation. Id. The Third Circuit rejected the defendant's argument and upheld the district court's decision to submit the issue of causation to the jury. Id. In the Court's view, the district court properly denied judgment as a matter of law because the plaintiff showed a temporal connection *and* other facts that gave rise to the inference

of retaliation. Id. These other facts related to the defendant's knowledge of plaintiffs' conduct, the defendant's feelings about that conduct, and the defendants own role in the termination. Id. In the Third Circuit's view, such facts "were sufficient to establish a *prima facie* case." Id.

The Court finds that, similar to Reilly, summary judgment is inappropriate because a reasonable trier of fact could infer causation based on the existence of a pattern of antagonism and a temporal link between the protected speech and the termination.  As an initial matter, Klein has produced evidence from which a reasonable jury could find the existence of a pattern of antagonism. Klein vociferously complained about perceived departmental malfeasance as early as 2010, which correlated temporally with a number of perceived retaliatory actions. (See Statement of Facts Parts I, III.)   A finder of fact could determine that the myriad of inconveniences suffered by Klein during the same period as his complaints raises the inference of a pattern of antagonism.

However, a pattern of antagonism does not, by itself, create a triable issue of fact. The Court also finds that Plaintiff Klein has also proffered sufficient evidence of a temporal link between the protected speech and his termination—the second element of the antagonism and time test. Klein uttered his protected speech before the Browndorf Grand Jury on September 22, 2011. (Ex. R. 1.) Even though it is unclear from the record when Klein's testimony was unsealed, Chief Shook's report on the July 26, 2011 incident indicates that Shook interviewed Klein on November 15, 2011. (Ex. O 1.) This report—which recommended that Klein be terminated—was issued on February 13, 2012 (Ex. O 1), and by March 8, 2012 Plaintiff Klein received an official termination letter from Bucks County (Ex. U 1). Even calculating the longest possible timespan—between the actual uttering of his speech at the Grand Jury and his termination the following March—the amount of time would only be 170 days. However, the timespan is probably much shorter, considering the Grand Jury testimony would not have been unsealed until sometime later. In either case, Plaintiff Klein's alleged link is far shorter than the ten years considered sufficient by the Third Circuit in Reilly. See also McNeilly v. City of Pittsburgh, 40 F.Supp.3d 643,655 (W.D.Pa. 2014) (denying a motion to dismiss for failure to state causation where the plaintiff was terminated approximately six years after the protected speech).  Accordingly, the Court finds that Plaintiff Klein has proffered sufficient evidence of a temporal link, and has therefore made the requisite showings under the antagonism and time test to create a triable issue of fact.

### C.  A Genuine Issue of Material Fact Exists as to Whether Plaintiff Klein Would Have Been Terminated Absent His Protected Speech

The Court now turns to the second question of fact presented by Defendants' Motion for Summary Judgment: whether Plaintiff Klein would have been terminated absent his protected speech. At the outset, the Court notes that both parties have cited to case law describing retaliation under Title VII, and various other pieces of civil rights legislation. (See, MSJ 31-33; Pls.' Resp. 16.) Although not controlling in this matter, the Court finds that these analogies are appropriate. See Ambrose v. Twp. of Robinson, 303 F.3d 488, 494 (3d Cir. 2002) (noting at least one occasion where the Third Circuit has imported Title VII concepts into First Amendment retaliation analysis).

Defendants present two rationales for granting their Motion for Summary Judgment on this point. First, Defendants argue that Klein has failed to offer "any facts that suggest that plaintiff's termination for his failure to report Browndorf's crimes was pretextual." (MSJ 32.) In their view, Klein's offered evidence amounts to "baseless speculation" that he was fired for any other reason than his failure to report the July 26, 2011 incident. (MSJ 32.) Second, Defendants argue that Plaintiffs have offered no proper comparators that would help establish that Defendants' justification for termination was pretextual. (MSJ 33.) They cast the proper comparison as between Klein and another "employee who witnessed a crime against a citizen by an employee of the Sheriff's Department, knew that the citizen was wrongfully charged with a felony and incarcerated, and failed to take any action to report that crime." (MSJ 33.) Because Plaintiffs Klein and McAndrew are the only two individuals who fit that description, Defendants assert that there is no genuine issue of material fact. (MSJ 33.)

Plaintiff attempts to cast doubt upon Defendants' same decision defense in two different ways. As an initial matter, Plaintiff Klein asserts that Sheriff Donnelly, as the only person with authority and ability to terminate Klein, "testified to wildly varying reasons for the termination, some of which are untrue, and others that make little sense." (Pls.' Resp. 17.) Next, Plaintiffs attack the Shook report. (Pls.' Resp. 21.) And finally, Plaintiff Klein asserts the existence of several comparators, which further undermine Defendants' same decision defense.

### i.  Standard

If a plaintiff demonstrates that the First Amendment protects his speech and that the protected speech was a substantial factor in the alleged retaliation, the burden shifts to the

defendant to prove the same decision defense. <u>See</u> <u>Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 285-86 (1977) ("The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct."); <u>see also</u> <u>Suppan v. Dadonna</u>, 203 F..3d 228, 236 (3d Cir. 1999) ("[T]he defendants, in proving 'same decision,' must prove that the protected conduct was *not* the but-for cause.") (emphasis in original). A defendant accomplishes this by "demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of protected conduct." <u>Watters v. City of Phila.</u>, 55 F.3d 886, 892 (3d Cir. 1995). "While but-for causation is the ultimate question, it is the defendants' burden to prove lack of but-for causation." <u>Suppan</u>, 203 F.3d at 236.

For his part, a plaintiff may avoid summary judgment "by offering evidence that discredits the reasons articulated by the defense for the adverse employment action." <u>Montone v. City of Jersey City</u>, 709 F.3d 181, 191 (3d Cir. 2013).  A plaintiff accomplishes this by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a reasonable factfinder could find them unworthy of credence." <u>Simpson v. Kay Jewelers.</u>, 142 F.3d 639, 644 (3d Cir. 1998). In so doing, a plaintiff need not produce evidence that "necessarily leads to the conclusion that the employer acted for discriminatory reasons, nor produce additional evidence beyond her *prima facie* case." <u>Id.</u> (internal citations omitted).

### ii.  Application

Although this issue presents a closer question, the Court finds that summary judgment on this issue would be inappropriate. The Court reaches this conclusion for two reasons. First, the Court finds that accepting Defendants' rationale at this point would require the Court to inappropriately judge credibility. And second, the Court concludes that sufficient comparator evidence exists to create a genuine question of material fact concerning the same-decision defense

### 1.  The Court Will Not Make Credibility Determinations at the Summary Judgment Stage

As a general matter, Defendants ask the Court to find a total failure of the Plaintiff's evidence on the same decision defense. In essence, Defendants ask the Court to credit their proffered rationale for Klein's termination: failing to report Browndorf's conduct during the July

26, 2011 incident. Ratifying this stated reason would require the Court to inappropriately engage in the weighing of evidence. <u>See</u> <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989) ("[C]redibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.")

The Court finds that the language of Klein's termination letter and Donnelly's subsequent explanations create a genuine question of fact that the Court would have to adjudicate were it to grant this Motion. The termination letter claims that Klein violated his oath of office by submitting false records (Ex. U 5.) Specifically, the letter explains that "to submit falsified documents as official factual reports of incidents, and then fail to testify as to submitting them is in violation of this sworn oath." (Ex. U 5.) The letter concludes by stating that Klein's conduct "shows dishonesty and a sever [sic] lack of credibility that is needed to be a law enforcement officer." (Ex. U 5.) When asked why this was included in Klein's termination letter, Sheriff Donnelly explained that he thought that Plaintiff Klein had testified falsely to County detectives who were investigating Browndorf. (Donnelly Dep. 251:6-252:3.) However, Donnelly conceded that he never reviewed the testimony that Klein or McAndrew provided. (Donnelly Dep. 251:4-6) ("Q: Did you review the testimony that [Klein and McAndrew] gave to the County detectives? A: No.") Moreover, Donnelly admitted that he was not "aware of" any written documents produced by Klein or McAndrew. (Donnelly Dep. 251: 7-9.)  Based on the foregoing, the Court finds that a reasonable jury could conclude that Donnelly's admittedly unverified conclusions render the proffered reason for Klein's termination "unworthy of credence." <u>Simpson</u>, 142 F.3d at 644 (3d Cir. 1998).

### 2. Comparator Evidence Creates a Genuine Issue of Material Fact Concerning the Same Decision Defense

In addition, the Court finds that sufficient comparator evidence exists for a reasonable jury to conclude that Defendants' reason for termination was pretextual. In the Title VII context to which we analogize here, a similarly situated employee "does not need to be identically situated, but the comparator must be similar to plaintiff in all relevant respects." <u>Abdul-Latif v. Cnty. of Lancaster</u>, 990 F.Supp.2d 517, 526 (E.D. Pa. 2014); <u>see also</u> <u>Doe v. Apria Healthcare Group, Inc.</u>, 97 F.Supp.3d 638, 645 (E.D.Pa. 2015). When assessing a comparator, "[c]ontext matters." <u>McCullers v. Napolitano</u>, 427 Fed.Appx. 190, 195 (3d Cir. 2011). Accordingly, a court

should consider whether "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct." Id.[13]

In their Memorandum of Law, Defendants cast the proper comparator as another "employee who witnessed a crime against a citizen by an employee of the Sheriff's Department, knew that the citizen was wrongfully charged with a felony and incarcerated, and failed to take any action to report the crime." (MSJ 33.) The Court rejects the first and second clauses of this construction, but will adopt the third. Defendant's first clause improperly relies on the assumption that Plaintiffs Klein and McAndrew witnessed Browndorf commit a crime—something that was only determined with any certainty much later. The second clause is irrelevant -- that Klein and McAndrew may have attended some of Romanek and Doneker's respective criminal proceedings and learned of their circumstances simply does not help the Court determine whether the proffered comparators are actually valid comparisons.

Having rejected Defendants' overly narrow construction, the Court finds that "relevant respects" for comparison in this case encompass: (1) whether a deputy was present at the execution of the warrant for Philip Romanek's arrest on July 26, 2011; (2) whether the deputy was under the command of Sergeant Browndorf at the incident; and (3), whether the deputy issued an accurate report of the events at the Romanek arrest. These three factors properly account for the full context of the circumstances of before the Court, and our sister courts' interpretation of the law on this issue. See Doe v. Apria Healthcare Group, Inc., 97 F.Supp.3d 638, 645 (E.D.Pa. 2015); Abdul-Latif v. Cnty. of Lancaster, 990 F.Supp.2d 517, 526 (E.D. Pa. 2014).

Under the Court's construction of the inquiry, Deputy Boyle and Corporal Prudish provide sufficient comparators. Like Plaintiff Klein, Boyle participated in the execution of the warrant (having been the Deputy to lower Romanek from Doneker's attic to Browndorf, Klein, and McAndrew below), acted under the command of Sergeant Browndorf at the incident, and did not report author a report in the wake of the warrant service.  (Statement of Facts Part II.A.) Similarly, Corporal Prudish was present at Doneker's house during the warrant execution, served as Browndorf's second in command, and failed to author *an accurate* report of the events on July

---

[13] The Court notes that its articulation of the rule on this issue relies on the opinions of a co-equal court, and at least one non-precedential opinion from the Third Circuit. Although under no obligation to apply the standards enunciated by either source, nonetheless, the Court chooses to do so in the interest of judicial comity.

21. (Statement of Facts Part II.A; Statement of Facts Part II.D.)  Accordingly, the Court finds that both present valid comparisons to Plaintiff Klein.

Additionally, the Court concludes that the treatment of Boyle and Prudish casts sufficient doubt upon Defendants' proffered reason for terminating Plaintiff Klein so as to create a genuine issue for trial. Boyle continued to work for the Sheriff's Department, despite the similarity between his conduct and Plaintiff Klein's conduct. Although the question is closer, [14] the Court finds that, in light of the procedural posture of the case, Prudish's treatment would also permit a reasonable jury to determine that the Sheriff's explanation for terminating Klein was pretextual. See Somerset Consulting, LLC v. United Capital Lenders, LLC, 832 F.Supp.2d 474, 479 (E.D. Pa. 2011) ("In evaluating a Rule 56 motion, we must draw all reasonable inferences in favor of the nonmoving party.") (internal quotation omitted).

In light of the foregoing, the Court denies summary judgment insofar as Plaintiff Klein brings a First Amendment claim based on his testimony before the Browndorf Grand Jury.

## II.     Defendants Are Entitled to Summary Judgment With Respect to Plaintiff Klein's Pennsylvania Whistleblower Law Claim

The Pennsylvania Whistleblower Law (PWL) prohibits an employer from discharging or retaliating against an employee because an employee makes "a good faith report…to the employer or appropriate authority [of] an instance of wrongdoing or waste by a public body." 42 P.S. § 1423(a).[15] In order to state a *prima facie* case, a plaintiff must "show by a preponderance of the evidence that, prior to the alleged reprisal, the employee…reported or was about to report in good faith…an instance of wrongdoing or waste." 42 P.S. § 1424(b); see also O'Rourke v. Commonwealth, 778 A.2d 1194, 1199-1200 (Pa. 2001). The PWL also provides for an affirmative defense, which largely tracks the same-decision defense under First Amendment

---

[14] There exists some question about Prudish's treatment. Sheriff Donnelly conceded that he "agreed to allow Prudish to come back despite the fact that [he] knew that [Prudish] crated a false report and lied to a grand jury." (Donnelly Dep. 123:23-124:2.) When asked whether his decision to bring Prudish back was "voluntary," Donnelly responded, "Yes." (Donnelly Dep. 124:6-8.) In Defendants' Reply Brief, they state that Prudish returned to the Department only after settling a grievance. (Defs.' Reply 22 n.20.) This question about Prudish's treatment, however, further demonstrates the need for a jury determination.

[15] The Court notes that it is exercising its supplemental jurisdiction to adjudicate this state law claim. See 28 U.S.C. § 1367(a). The Court possesses original jurisdiction over the First Amendment retaliation claim, and the facts underlying the PWL claim "form part of the same case or controversy under Article III of the constitution." 28 U.S.C. § 1367(a). Accordingly, this Court possesses jurisdiction to adjudicate the PWL claim within 28 U.S.C. § 1367(a). The Court also notes that even though it will apply Pennsylvania substantive law, federal procedural law still controls. See Hanna v. Plumer, 380 U.S. 460, 465 (1965).

jurisprudence. 42 P.S. § 1424(c) ("It shall be a defense…if the defendant proves by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual.").

Defendants offer three arguments to support summary judgment in their favor. First, they argue that Plaintiff Klein has failed to make good faith complaints of wrongdoing or waste as defined by the statute. (MSJ 34.) Second, Defendants assert that even if he did complain about wrongdoing or waste, he could not meet the PWL's high standard of causation. (MSJ 37.) And third, even if the Court finds that Plaintiff Klein has made the requisite showings under the first two inquiries, Defendants assert that he would have been subject to the same adverse action despite his reports. (MSJ 41.)

### A. Plaintiff Klein Has Failed to Offer Sufficient Evidence to State a *Prima Facie* Case

#### i. Standard

In order to state a *prima facie* case under the PWL, a plaintiff must demonstrate that he or she reported an instance of "wrongdoing or waste" as those terms are defined in the statute. O'Rourke v. Commonwealth, 778 A.2d 1194, 1199-1200 (Pa. 2001); see also, 43 P.S. § 1422. The statute defines "wrongdoing" as a "a violation which is not merely of a technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 42 P.S. § 1422. The statute subsequently defines "waste" as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 42 P.S. § 1422. Accordingly, the PWL "does not protect every critical or damaging report that an employee may make to or about her employer—only those reports of wrongdoing or waste within a narrower meaning of the statute are protected." Johnson v. Resources for Human Dev., Inc., 789 F.Supp.2d 595, 601 (E.D. Pa. 2011).

The Court is also mindful of its obligations pursuant to Federal Rule of Civil Procedure 56 and precedent interpreting that rule. In order to defeat summary judgment, the non-movant must establish that any alleged disputes of fact are both "(1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### ii. Application

The Court finds that Defendants are entitled to summary judgment because Plaintiff Klein failed to "make a showing sufficient to establish the existence of an essential element" of his case, namely, that any of his complaints qualify for protection under the PWL, which is a question of law. Celotex, 477 U.S. at 322.

### 1. Plaintiff Klein's Argument Concerning the Motion to Dismiss Opinion is Without Merit

Before the Court turns its attention to the specifics of Plaintiff Klein's complaints, it must first address his argument concerning this Court's opinion resolving Defendants' Motion to Dismiss. Klein contends that the Court's opinion "addressed the issues of compliance with the PWL, *including activities and causation*." (Pls.' Resp. 10) (emphasis added). Because the subsequent deposition testimony has "fully tracked" his Complaint and the Court's previous Opinion, Klein urges the Court to adopt the findings at the Motion to Dismiss stage. (Pls.' Resp. 10.)

The Court rejects this characterization of its Opinion. In the Klein Opinion, the Court made clear that Defendants only challenged Klein's ability to state causation under the PWL. (Klein Mem. Op. 5) ("Defendants ague that Klein's allegations that he was terminated after making complaints about the Department must be dismissed because he fails to sufficiently plead that his acts of whistleblowing *were casually connected to his termination*.") (emphasis added). Accordingly, this Court only addressed the causation issue, and did not address whether the PWL protected Klein's complaints. Thus, even if the record "fully tracked" Klein's complaints, the Court would still have to address whether his complaints qualified for PWL protection.

### 2. Klein Has Failed to Create a Genuine Issue of Material Fact With Respect to His Complaints

Klein asserts protection under both the "wrongdoing" and "waste" categories of speech protected by the PWL. The Court addresses each in turn.

### a. Plaintiff Klein's Claims of Wrongdoing Fail For Want of Evidence

In order to state a *prima facie* case, Plaintiff Klein must point to Defendants' violation of a specific statute, regulation, ordinance, or code of conduct or ethics. 42 P.S. § 1422; 42 P.S. § 1424(b). The Court notes that the precise inquiry on this issue is *not* whether Klein made these statements as a matter of fact. Rather, the Court must determine whether *the substance* of Klein's complaints alleged a violation of a *specific* legal or ethical authority. Sukenik v. Township of Elizabeth, ---A.3d---, 2016 WL 47824 *4 (Pa. Commw. Ct. 2016) ("The report [of wrongdoing] must provide information that is sufficient to identify the law allegedly violated; reports of vague or subjectively wrong conduct are not considered wrongdoing under the [Pennsylvania] Whistleblower Law.") (internal citation omitted); see also Riggio v. Burns, 711 A.2d 497 (Pa. Super. Ct. 1998). The Court finds that Plaintiff Klein failed to offer enough evidence of such a violation as to create a triable issue of fact. Celotex, 477 U.S. at 322. The Court will first analyze the firearms, sleeping guard, and vehicle malfunction claims, then proceed with the Policies and Procedures complaint and the Corruption complaint.

### i. Plaintiff Klein Has Not Met His Burden of Proof With Respect to the Firearms, Sleeping Guard, and Vehicle Malfunction Complaints

Klein's complaints concerning "firearm safety, certifications, falsification of certifications and armor qualifications" fail for a lack of evidence of a specific violation of a source of legal or ethical authority. (Pls.' Resp. 10.) As evidence for the specific violation, Klein points to his own deposition testimony. (Pls.' Resp. 10.) Therein, Klein states that, "[t]here's a law that requires law enforcement officers to be qualified with firearms and that has to be done by a certified instructor." (Pls.' Resp. 10) (quoting Klein Dep. 32-33). However, Klein has offered no specific authority that would undergird his claim. (Pls. Resp. 10.) Moreover, Klein has not offered any precedent that would require this Court to accept his subjective belief concerning the existence of "a law" as evidence of a violation of specific authority. (Pls.' Resp. 10) (quoting Klein Dep. 32-33). Having failed to point to any more specific articulation of a law, see Sukenik, 2016 WL 47824 at *4, Klein has failed to create a genuine issue of material fact as it applies to the firearm complaints.

Klein's claim concerning a "guard sleeping on the job" and vehicle maintenance fail for the same reason. In these instances, Klein has failed to offer a reference to a violation of a specific provision of a legal or ethical authority. Id. The sum total of Klein's defense of the sleeping guard allegation reads, Plaintiff Klein "complained about a Deputy sleeping while on the job guarding inmates. Such conduct clearly violates the code of conduct and ethics of the Sheriff's Department" (Pls.' Resp. 11.) Klein provides a citation to Exhibit U, which contain copies of Plaintiff Klein and Plaintiff McAndrew's termination letters and what appears to be the Sheriff's Department's Human Resources' Policy. (Pls.' Resp. 11.) Similarly, his defense of the vehicle malfunction complaint states: "Plaintiffs made complaints about their vehicles lacking proper sirens, and not properly functioning. Not only would ignoring these complaints demonstrate wrongdoing, allowing the vehicle to be in this condition violates the Pennsylvania Motor Vehicle Code." (Pls.' Resp. 11.) In neither case did Plaintiff Klein present a reference to a violation of a specific statute, regulation, ordinance, or code of conduct or ethics that would allow this court to identify a law or code specifically violated. See Sukenik, 2016 WL 47824 at *4. Accordingly, Klein has failed to create a genuine issue of material fact on this issue, and summary judgment in favor of Defendants is appropriate.

    ii.  **The Lack of Policies and Procedures Regarding Safety Matters Complaint Also Fails for Lack of Evidence**

Before turning to the specifics of Plaintiff Klein's failure of evidence, the Court notes that it finds the Pennsylvania Superior Court's decision in Riggio v. Burns to be particularly instructive. 711 A.2d 497 (Pa. Super. Ct. 1998). In Riggio, the Superior Court considered whether a neurologist's complaints concerning a supervising physician's failure to be physically present in the operating room while residents conducted surgical procedures constituted "wrongdoing" for purposes of the PWL. Id. at 498. In support of her position, the plaintiff proffered specific provisions of Pennsylvania statutes that set licensing standards for physicians and healthcare facilities. Id.at 501. The *en banc* majority of the court determined that "the regulatory statutes cited by [the plaintiff] are entirely too general and vague to permit the conclusion that a violation had occurred amounting to 'wrongdoing' under the Whistleblower Law." Id. Elaborating, the court noted that "because standards such as these are subject to

interpretation, and do not *specifically* define prohibited conduct, it is not at all clear when they would be violated in such a way as to amount to wrongdoing." Id.

In the case at bar, Plaintiff Klein offers the testimony of an expert in support of his claim that the Sheriff's Department's failure to enact specific policies and procedures regarding "safety matters" constitutes a cognizable complaint of wrongdoing. (Pls.' Resp. 10.) Specifically, Klein quotes the expert report which states, "[t]his failure to train BCSD deputies in the Constitutional limitations of force falls below national force standards, national force training standards, and other generally accepted force guidelines and recommendations." (Pls. Resp. 10.) Even assuming the admissibility of the expert's testimony, like the evidence proffered in Riggio, Klein's evidence of wrongdoing is "entirely too general and vague." 711 A.2d at 501. In fact, the question before this Court is far easier than the one in Riggio, as the plaintiff in that case offered *specific statutory provisions*. Here, the expert offers nothing but formless "generally accepted force guidelines and recommendations" as the basis for a cognizable complaint of wrongdoing. Accordingly, the Court finds that Plaintiff Klein has not offered evidence sufficient to create a triable question of fact.

### iii.  Plaintiff's Claim of Corruption Also Fails for Lack of Evidence

At the outset, the Court notes that the PWL only offers protections to employees who make very specific types of complaints. See Johnson v. Resources for Human Dev., Inc., 789 F.Supp.2d 595, 601 (E.D. Pa. 2011).  Thus, even though certain complaints might raise serious issues concerning the integrity of public officials, they cannot provide a basis for a PWL wrongdoing claim unless the plaintiff offers evidence of a specific violation of a statute, regulation, ordinance, or code of conduct or ethics. See id.

Plaintiff Klein, and his partner James McAndrew, complained to Bucks County Commissioner Diane Ellis-Marseglia and Bucks County Investigator David Rouland of perceived corruption in the Sheriff's Department. (Statement of Facts Part I.E.) Specifically, they alleged that Sheriff Donnelly required Department employees to participate in political activities on his behalf, and that there existed some kind of vehicle maintenance bid-rigging scheme. (Statement of Facts Part I.E.) However, despite the sensational nature of these claims, the Court finds that Plaintiff Klein has failed to provide an adequate foundation to support a PWL wrongdoing claim. In his brief, Klein claims that "obviously, corruption constitutes wrongdoing.

Plaintiffs complained that there was bid rigging, political paybacks, and improper campaign activities all constituting protected speech under the PWL." (Pls.' Resp. 11.)  Unfortunately for Klein, however obvious it may seem that alleged corruption constitutes wrongdoing under the PWL, he has failed to make the requisite showing that Defendants violated a specific statute, regulation, ordinance, or code of conduct or ethics. See Sukenik, 2016 WL 47824 at *4. Accordingly, the Court finds that he has failed to provide evidence from which a reasonable trier of fact could return a verdict in his favor, and summary judgment is therefore warranted.

### b. Plaintiff Klein's Claim Predicated on Alleged Waste Also Fails for a Lack of Evidence

The PWL defines "waste" as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 42 P.S. § 1422. Here, Klein has only offered bald assertions concerning the evidence in this case. The sum of his defense of his PWL claim of waste states: "Plaintiffs have presented evidence that they complained about Sheriff Donnelly ordering Sgt. Browndorf to conduct political activities while on the clock, that weapons certifications were improper, and that the effort to correct the certification issue was false." (Pls.' Resp. 11.) Aside from the fact that this assertion is totally devoid of citation to the record, the Court notes that it is not enough to raise an inference of "substantial abuse, misuse, destruction, or loss of funds." 42 P.S. § 1422. Accordingly, the Court finds that Plaintiff Klein has failed to proffer any evidence that would enable a reasonable jury to return a verdict in his favor.

Because Klein has failed to make a showing sufficient to establish the existence of an element essential to his case—that he complained of Defendants' wrongdoing or waste as defined by the PWL—and on which he will bear the burden of proof at trial, the Court finds that summary judgment must be granted in favor of Defendants on this claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment in all respects, except to the extent that Count I relies on Plaintiff Klein's speech before the Browndorf Grand Jury. Accordingly, summary judgment is granted in Defendants' favor to the extent that Count I relies on Plaintiff Klein's speech during the Browndorf Disciplinary Hearing and Count II in its entirety. An appropriate order follows.

BY THE COURT:


/s/ C. Darnell Jones, II
C. Darnell Jones, II    J.